908 So.2d 255 (2004)
Susan L. GONZALEZ
v.
Richard P. GONZALEZ.
Richard P. Gonzalez
v.
Susan L. Gonzalez.
2020868.
Court of Civil Appeals of Alabama.
July 2, 2004.
Rehearing Denied September 24, 2004.
Certiorari Quashed March 18, 2005.
*257 Charles A. Dodson, Jr., and Joseph D. Steadman of Sims, Graddick & Dodson, P.C., Mobile, for appellant/cross-appellee Susan L. Gonzalez.
Claude D. Boone and Gregory M. Zarzaur of Claude D. Boone, P.C., Mobile, for appellee/cross-appellant Richard P. Gonzalez.
Alabama Supreme Court 1040052.
YATES, Presiding Judge.
Susan L. Gonzalez ("the mother") appeals from a judgment entered by the Mobile Circuit Court that, among other things, divorced her from Richard P. Gonzalez ("the father") and awarded the father custody of the parties' children. The father cross-appeals, arguing that the trial court erred in awarding the mother periodic alimony and an attorney fee. He also argues that the trial court erred in not ordering the mother to pay child support.
The parties were married in Illinois on February 10, 1990. At that time, the mother was a registered nurse and the father was a trauma surgeon. Two sons and a daughter were born of the marriage. At the time of the divorce, the older son was 12 years old, the younger son was 8, and the daughter was 7. The parties lived in Illinois until 1999, when they moved to Mobile.
The mother testified that the parties jointly decided in 1990 that she should leave the nursing profession to care for the children. The father is the director of trauma surgery at the University of South Alabama; he earns $290,000 per year. He testified that it was not a joint decision that the mother stop working and that he had asked her to return to work. The father testified that the mother could earn $45,000 per year as a nurse.
The mother testified that the father had a tendency to go out drinking after work in Illinois and that this behavior continued when the parties moved to Mobile. She testified that on their wedding night the father was so intoxicated that they were not intimate. The mother stated that a few days before her delivery of the older son she suffered from preeclampsia and an infection with a fever and a cough. She stated that she telephoned the father, who was at a Hooter's restaurant, to ask him if he would pick up some medication for her. However, she testified that the father did not return home that night and never answered his pager because he had passed out in his automobile. In 1995, the mother had to take the younger son, who was an infant at the time, to the emergency room because he had a viral infection. She telephoned the father, who was at a bar, and he swore at her and refused to meet her at the emergency room. The father did not return home that night. In 1997, the father was arrested in Illinois and charged with driving under the influence ("DUI"). The mother testified that the father has befriended Jim Walker, who owns a bar in Mobile, and that the father frequents Walker's bar.
*258 The mother testified that she believed the father was unfaithful to her with a doctor who was completing her residency under the father's direction. She stated that she received telephone calls from a hospital employee telling her of the father's affair. The mother testified that at the time of the father's alleged affair, she was pregnant with the younger son and her obstetrician discovered that she was infected with chlamydia, a sexually transmitted disease. The father denied being unfaithful.
The mother stated that she was very involved in all the children's activities. She testified that the older son plays soccer and baseball and that he was a member of an elite soccer team that traveled to out-of-town matches. The mother was the manager of the son's team and helped to coordinate many aspects of the team's activities. She stated that she would take all three children to the soccer matches. The mother testified that the father rarely attended the soccer matches.
The mother stated that she took care of the children's educational needs. She testified that she was a room mother at the children's school, helping with parties for the children's classes and relieving the teachers on their lunch hour. The mother stated that she took care of the children's health needs. She testified that she took care of the children when they were sick and that she took the children to their doctor and dentist appointments. The mother stated that some of the children had allergic reactions to certain medication but that the father was confused as to which ones had the allergies when he took them on a trip to Baton Rouge after she filed for a divorce.
The mother testified that in May 2001 Patrick Wittenbrink, a college baseball player, moved into the family home. She stated that Wittenbrink paid her $300 per month in rent, which she deposited in the couple's joint checking account. She said that Wittenbrink helped the older son with baseball and that when Wittenbrink moved in she was planning on returning to school and believed that she would need help with the children.
The mother testified that the father was verbally and physically abusive. The mother stated that on one occasion a few years before the trial in this matter, the father had pushed the mother against a door and choked her because a family pet had urinated on his exercise mat. The mother testified that in April 2002 the parties were on a trip to New Orleans for one of the older son's soccer matches. She stated that the father had been drinking and that the father called her an obscene name several times while the children were awake in the next room. The mother stated that the father shoved her against the door twice, leaving a bruise to her sternum. The father admitted being drunk and calling the mother the obscene name. The mother stated that the incident in New Orleans "was the straw that broke the camel's back," prompting her to file for a divorce in May 2002.
The mother admitted that after she had filed her petition for a divorce, she had a three-month affair with Craig Ginsberg, the older son's soccer coach. The mother testified that at the time of trial the affair was over. The father presented evidence that the mother had spent 107 hours on the telephone with Ginsberg from October 2001 to December 2002, with the time dramatically increasing near the time she filed for a divorce.
Patty Norris, a teacher at the private school attended by the children, testified that she taught the younger son and the daughter. She also knew the older son because she has a child in the same grade at the school. She stated that she had *259 been a teacher for 25 years and that the mother was one of the best room mothers that she had ever had. She said that the older son is well-rounded, sweet, and very athletic. She testified that the younger son is quiet, loving, sweet, and kind and that the daughter is a "fun loving, wonderful little girl." Norris testified that she has seen the mother interact with the children and that the mother is very close to the children. She said that the school does not have a parent-teacher association but that each teacher has parent-teacher conferences. She stated that the mother attended all of the parent-teacher conferences concerning the younger son and daughter and that the father had never attended the conferences.
Rachel Frederick, also a teacher at the children's school, testified that she was the daughter's teacher at the time of trial. She said that the daughter is well-adjusted, a leader in the classroom, and that she wished she had a "room full" of children like the daughter. She said that she sees the mother quite often at the school because the mother relieves the teachers at lunch time. Frederick testified that she had met with the father only once after he telephoned in October 2002 requesting a conference. She stated that in talking with the father and observing him, he did not appear sincere and that he stated that he was trying to get custody of the children.
Daniel Koch, a clinical psychologist, testified on behalf of the mother. As part of his evaluation, Dr. Koch interviewed the family. He also administered several psychological tests to the mother and the children. The father made three appointments to participate in the psychological testing, but he subsequently canceled each appointment. Dr. Koch testified that the mother should have custody of the children. He stated that the mother had taken care of the children's daily needs.
Logan Cowart, who has a son on the older son's soccer team, testified that the mother generally stays to watch soccer practice and that one day per week the mother helps to train the soccer players by running with them as a group. Cowart testified that occasionally one of the soccer coaches would stay in the parents' rooms during the out-of-town trips because the coaches "were young and couldn't afford it" and because it helped keep the costs down for the soccer team if the coaches did not have to be reimbursed for a room. Cowart testified that, based on her observations of the mother for the last four years, she thought the mother was a good mother.
The older son testified that he loved both the mother and the father. He stated the mother has been the person who has taken care of him over the past 12 years. He said he wanted to live with the mother. He stated that either the mother or father would fix breakfast for him, but that recently the father had fixed breakfast. He also testified that since the mother had filed for a divorce the father bought the groceries.
The older son stated that he had recently gone to church with his father and that in front of the church the father grabbed him and said, "Stop it, because we're in theright in front of a fucking church." The older son testified that when a soccer coach would stay in a hotel with the mother and the children, they all stayed in a suite that had more than one bedroom and that the coach would stay in a different bedroom and a different bed than the mother and the children. The older son's testimony indicated that he was not aware of any inappropriate relationship between the mother and Ginsberg, his soccer coach.
*260 William Harrison, the older son's baseball coach, testified that the father was an assistant coach in 2002 and that the father regularly attended games before he was an assistant coach. He stated that on one occasion the mother introduced him to Wittenbrink and indicated that Wittenbrink would like to help coach the baseball team.
Phillip Gachassin, M.D., a former medical resident at the father's hospital, testified that the father was his instructor. He stated that he had been to the parties' home a few times and that he had seen the father interact with the children in a friendly and active manner. He testified that on occasion he would go to bars with the father but that the father's social life never interfered with his work.
Jeffrey Ikler, M.D., a colleague of the father, testified that he had been to the parties' home two or three times and that he observed that the father had a very good relationship with the children. He stated that on occasion he and the father would go to a bar for a drink. He stated that he had been at the bar late at night with the father. Dr. Ikler stated that the father oversees all the surgical care units at the University of South Alabama. He testified that the father is responsible for every trauma case at the hospital and that the father also travels to lecture on trauma care.
Thomas Bennett, a clinical psychologist, testified on behalf of the father. He stated that the father had brought the older son to him after the mother had filed for a divorce. Dr. Bennett testified that he interviewed the father, the mother, and the children; however, he did not perform any psychological tests. Dr. Bennett testified that his role was as a therapist to the older son and that he was not hired for the purpose of a custody battle. However, he opined that the parents should have joint custody and that the father should have primary physical custody of the children because, he said, the mother had had an affair and because she refused to take responsibility for the couple's problems.
The father testified that he is the primary caregiver for the children. He stated that he makes breakfast and supper for the children and that he does the grocery shopping. The father admitted that he made derogatory comments to the wife when she was overweight and that he had encouraged her to lose weight. He testified that the mother became "self-absorbed" and "self-centered" after she began losing weight.
The father testified that he believed that the mother had had an affair with Wittenbrink, the college baseball player who lived in the parties' home in May 2001. However, the father admitted that he never asked Wittenbrink to leave the parties' home, that he went out drinking with Wittenbrink, that he worked out with Wittenbrink, and that he recommended Wittenbrink for admission into law school.
The father testified regarding his work schedule. He stated that he is in charge of the trauma unit that cares for all trauma patients at the University of South Alabama. His work involves critical care as well as surgery. The father testified that because of his work schedule he would have to hire help to care for the children if he were awarded custody. He stated that he could not control when he was called to the hospital for an emergency.
The father admitted that he had called the mother profane names on occasion. He admitted that there had been sporadic instances of physical violence between him and the mother, but he stated that the mother was the instigator and that he had defended himself. He admitted drinking alcohol to excess. The father testified that *261 he owned and watched pornographic videos, and he admitted that he watched pornography on the Internet.
The father admitted that he hid $10,000 in Jim Walker's bank account during the divorce proceedings. He said that he hid the money in Walker's account in order to hire an additional lawyer but that he did not want it known until he had hired the lawyer. He testified that if he obtained custody he would want to live in the marital home but that if the mother were awarded custody he would want her and the children to live in a place that the mother could afford. Since the mother filed for divorce, the father had taken the children to Disney World, Baton Rouge, and Chicago.
Arnold Luterman, M.D., a colleague of the father's, testified that the father was a hard worker and that in addition to being on call at University Hospital the father was also on trauma call for Knollwood Hospital.
Following the proceedings, the guardian ad litem appointed to represent the children's interests recommended that the mother have custody. On February 21, 2003, the trial court divorced the parties without making any finding as to adultery and awarded custody to the father. Both the mother and the father filed postjudgment motions. The guardian ad litem also filed a postjudgment motion. The mother filed an instanter motion for custody, alleging, among other things, that the father had left the children at home alone on several occasions.
The trial court held a hearing on the postjudgment motions and the mother's instanter motion. At the hearing, the trial court took additional testimony.
The older son testified that the father had left the children home alone on two or three occasions since the divorce. He stated that he wanted to live with the mother. He also stated that the father was angry at him for his testimony during the divorce proceedings. The younger son and the daughter also testified that the father had left them at home alone. Both the younger son and the daughter testified that they wanted to live with the mother.
Carrie McCarthy, the father's cousin, was hired to act as the children's nanny and arrived in Mobile on April 11, 2003. She testified that she had been treated for depression. She said that she became upset when the father had become angry with her when she took the children to buy a gift for the mother for Mother's Day because the father had wanted to do that.
Jim Walker testified that he babysat for the children when the father was called to work and that he has occasionally slept in the nude at the family home with the children present in the home. Walker testified that he had been out drinking with the father and the nanny on several occasions since the divorce became final.
The trial court denied all the postjudgment motions and denied the mother's instanter motion for custody.
"In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. The trial court's overriding consideration is the children's best interests and welfare." Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994) (citations omitted).
"In considering the best interests and welfare of the child [in a child-custody case], the court must consider the individual facts of each case:
"`The sex and age of the children are indeed very important considerations; however, the court must go beyond these to consider the characteristics and needs of each child, including *262 their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose.'"
Gilliam v. Gilliam, 876 So.2d 1135, 1141 (Ala.Civ.App.2003)(quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981)).
It is well-settled that where the trial court receives ore tenus evidence in a divorce case, its custody determination based on that evidence will be presumed correct and will not be reversed absent a finding that the custody award was plainly wrong. Tribble v. Washington, 675 So.2d 468 (Ala.Civ.App.1996).
In the present case, the trial court did not make any specific findings of fact concerning its award of custody. Therefore, we must assume that the trial court made the findings necessary to support its judgment, unless such findings are clearly erroneous. Ex parte Patronas, 693 So.2d 473 (Ala.1997). We note that even if the trial court had found that one of the parties had committed adultery, a finding of adultery is not, in and of itself, an absolute bar to custody; rather, such a finding is, along with the other facts presented in the case, a matter for consideration by court. Mason v. Mason, 276 Ala. 265, 160 So.2d 881 (1964); Smith v. Smith, 599 So.2d 1182 (Ala.Civ.App.1991); see also Martin v. Martin, 623 So.2d 1167 (Ala.Civ.App.1993)(trial court did not err in awarding mother custody although mother had committed adultery); Altieri v. Altieri, 528 So.2d 861 (Ala.Civ.App.1988)(trial court did not err in awarding custody to the father even though the father admitted to adultery).
We have carefully reviewed the record and conclude that the trial court's award of custody to the father was unsupported by the evidence presented because the custody award does not serve the best interests of the children. The mother has been the parent responsible for the children's health-care needs. She has transported the children to the doctor's office and cared for the children when they were ill. The mother has regularly met with the children's teachers throughout their lives, in contrast to the father who has done so only recently as a result of the divorce litigation. It is clear that the children have a close relationship with their mother; all three children, after living with the father following the divorce, want to live with the mother. The father has a demanding work schedule that has required the hiring of a full-time nanny to care for the children's daily needs. Although the dissent focuses on Dr. Bennett's recommendation that the father have custody, even Dr. Bennett, the father's expert, testified that the children would be better off with either the mother or the father rather than a nanny.
It is clear from the record that the father admitted to drinking alcohol in excess, throughout the children's lives. We note that although the father stated he would want to live in the marital home *263 with the children if he were awarded custody, he would not want to provide his children with that home or one of that value if the mother were awarded custody. Each party accused the other of having an affair during the marriage. The mother admitted that she had had an affair after she had filed for a divorce; however, the older son's testimony reflects that he was unaware of the nature of that relationship.
The father criticized the mother for allowing one of the soccer coaches to stay in the same hotel suite with the family during soccer trips; however, the older son testified that the coach was in a separate bedroom. We note that on occasion when the father accompanied the family to an out-of-town soccer game, he also allowed a coach to stay with the family. Further, the father has allowed Jim Walker to spend the night in the nude in his home when the children were present.
Accordingly, that portion of the trial court's judgment regarding custody is reversed.
In his cross-appeal, the father argues that the trial court erred in awarding the mother periodic alimony and an attorney fee. He also argues that the trial court erred in failing to award him child support. Because we have reversed the trial court's custody determination, we pretermit discussion of the father's claim that he is entitled to seeking child support. With regard to the trial court's award of periodic alimony, the law in Alabama is well-settled. In determining whether to award periodic alimony, the trial court should consider the parties' present and future earning capacities, their ages and health, their conduct, the duration of the marriage, and the value and type of marital property. Taylor v. Taylor, 890 So.2d 151 (Ala.Civ.App.2004). The decision whether to award periodic alimony is within the sound discretion of the trial court, and that decision will not be set aside absent an abuse of that discretion. O'Neal v. O'Neal, 678 So.2d 161 (Ala.Civ.App. 1996). The father argues that the mother's adultery and her ability to earn $45,000 per year as a nurse warrant a reversal of the trial court's periodic-alimony award. Although the mother admitted having an affair after she had filed her petition for a divorce, the trial court did not make a finding of adultery on the part of either party, although there was testimony that both parties had committed adultery. The parties were married for 12 years. The father earns $290,000 a year. The mother did not work during the marriage because she cared for the children. The purpose of periodic alimony is to preserve the status quo of the parties, to the extent possible, as it existed during the marriage. Craft v. Craft, 647 So.2d 781 (Ala.Civ.App.1994). We cannot say that the trial court abused its discretion in awarding the mother periodic alimony.
The father argues that the trial court erred in awarding the mother an attorney fee because the mother committed adultery. In Rosser v. Rosser, 355 So.2d 717 (Ala.Civ.App.1977), this court acknowledged the right of the trial court to award an attorney fee to a spouse in a divorce case even though the spouse had committed adultery. We note that in this case the father did not seek a divorce on the ground of adultery and the trial court did not make a finding of adultery. Further, whether to award an attorney fee in a divorce case is within the sound discretion of the trial court, and such an award will not be reversed absent an abuse of that discretion. Glover v. Glover, 678 So.2d 174 (Ala.Civ.App.1996). We cannot say that the trial court abused its discretion in awarding the mother an attorney fee.
*264 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MURDOCK, J., concurs specially.
THOMPSON, J., concurs in the result, without writing.
PITTMAN, J., concurs in part and dissents in part, with writing, which CRAWLEY, J., joins.
MURDOCK, Judge, concurring specially.
After considering all of the evidence of record, including, but not limited to, that which is highlighted near the conclusion of the main opinion's discussion of the custody issue, I must conclude that the award of custody to the father rather than to the mother is against the great weight of the evidence. See generally Ex parte Monroe, 727 So.2d 104, 106 (Ala.1999) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala. 1977)); Garrison v. Kesek, 406 So.2d 953 (Ala.Civ.App.1981) (citing Hallford v. Hallford, 390 So.2d 295 (Ala.Civ.App.1980)). I therefore conclude that the custody award was palpably wrong, and, accordingly, I concur in the main opinion.
PITTMAN, Judge, concurring in part and dissenting in part.
The main opinion posits that the trial court's determination that to award the father custody of the children would be in their best interests is unsupported by the evidence. I disagree.
Although the main opinion intimates that the father has not had a close relationship with the children because of his work schedule, the parties' oldest child testified that the father had cooked breakfast for the family most days over the preceding several years; that child also testified that the father had been "pretty good" at working with him on his homework, had "always worked" with him on improving at baseball, and had taught the parties' youngest child to ride a bicycle. Other testimony indicated that the father played with the children and was active and friendly with them; in fact, one of the father's medical colleagues was impressed by the father's balancing of career and family obligations.
Dr. Thomas S. Bennett, a clinical psychologist who had been treating the parties' oldest child for depression and who had also evaluated both parties, opined that, of the parties, the father had exhibited the best judgment and the best capability to put aside the parties' animosity towards one another for the benefit of the children. While Dr. Bennett noted that the father had admitted to having verbally abused the mother and had indicated willingness to work on his weak points, he noted that the mother did not express any negative points about her own personality or character and that she did not assume any fault for the parties' strained relationship; indeed, according to Dr. Bennett, psychological testing of the mother revealed a histrionic and self-centered personality that impelled the mother to deny having any flaws. Although Dr. Bennett admitted that the mother had the "potential" to be a good parent and recommended that the mother have joint custody (subject to the father's primary physical custody), he also testified that the mother's tendency towards "acting out and failing to take responsibility and show good judgment" were characteristics that would not recommend her as a good role model for the children. Dr. Bennett added that the mother's having had an affair immediately after the parties' separation was, in his view, a "critical issue" in the case.
I recognize that adultery, in and of itself, does not absolutely bar a parent from *265 having custody; however, such conduct does, under Alabama law, bear upon the mother's relative unfitness to have custody. E.g., Harrison v. Harrison, 279 Ala. 675, 677, 189 So.2d 471, 473 (1966). Rather than basing its custody determination solely upon the mother's adultery, I believe that the trial court could have concluded from the evidence that the mother's adultery simply constituted an egregious manifestation of a tendency to rank her own interests first and that that court could have inferred that the children would not benefit from being placed in her custody. The words of our Supreme Court in Ex parte R.T.S., 771 So.2d 475 (Ala.2000), are thus brought to mind:
"Child-custody cases are among the most perplexing and heart-wrenching that appellate judges are called upon to review. We can rarely discern from a cold record exactly what kind of custody arrangement would be in the best interests of children already struggling to cope with the breakup of their family. For this reason, in such cases this Court has consistently adhered to a well-established standard for reviewing a trial court's factual findings based on disputed testimony. In Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996), this Court stated:
"`When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determinationit hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. . . .'
"Although it is difficult enough for a trial court to determine what custody arrangement would be in a child's best interests, that court is far better situated than an appellate court to make the credibility determinations that are necessary to any custody ruling. Neither the Court of Civil Appeals nor this Court may reweigh the evidence and substitute its judgment for that of the trial court. The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited factfinding."
771 So.2d at 476-77.
Based on the foregoing facts and authorities, I would affirm the trial court's judgment in its entirety. I therefore respectfully dissent from the main opinion insofar as it reverses that part of the trial court's judgment awarding custody of the children to the father. I concur in the main opinion insofar as it affirms the trial court's judgment as to the issues raised in the father's cross-appeal.
CRAWLEY, J., concurs.