THOMAS, Judge.
Lauren Alyse Hyche (“the mother”) appeals a judgment of the Walker Circuit Court (“the trial court”) in which the trial court, among other things, divorced her from Shanon Cruz Hyche (“the father”), *674 awarded the parties joint legal and physical custody of their son (“the child”), and ordered the father to pay child support. We affirm the trial court’s judgment in part, reverse it in part, and remand this cause to the trial court.
Background
The parties were married on June 2, 2012, and the child was born on August 20, 2013. The mother filed a divorce complaint on October 23, 2015, requesting, among other things, that she be awarded “care, custody!,] and control” of the child. The father answered the mother’s complaint and counterclaimed, requesting, among other things, that the parties be awarded joint legal and physical custody of the child. In December 2015, the trial court entered a pendente lite order that set out, in relevant part, the father’s scheduled “periods of physical custody” and required the father to pay the mother $400 per month as child support.
A trial was held on May 11, 2016, and the trial court entered a judgment the next day divorcing the parties and, among other things, awarding them joint legal and physical custody of the child and requiring the father to pay the mother $458 per month as child support. The mother filed a timely notice of appeal. On appeal, the mother argues that the trial court’s judgment should be reversed because its award of joint custody is improper and because its calculation of the father’s child-support obligation is incorrect.
Analysis
The mother first argues that the trial court’s judgment should be reversed because its award of joint custody “was not supported by the evidence, was not in the child’s best interest, was plainly and palpably, wrong, and exceeded the trial court’s discretion.”
“It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage. Joint custody does not necessarily mean equal physical custody.”
§ 30-3-150, Ala. Code 1975.
‘“[0]ur review of custody determinations based on ore tenus evidence is quite limited; the trial court’s custody judgment is presumed correct and should be reversed only if the judgment is plainly and palpably wrong.’ Smith v. Smith, 887 So.2d 257, 262 (Ala. Civ. App. 2003).
[[Image here]]
“In Graham v. Graham, 640 So.2d 963, 964 (Ala. Civ. App. 1994), this court wrote:
“ ‘In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. Hall v. Hall, 571 So.2d 1176 (Ala. Civ. App. 1990). The trial court’s overriding consideration is the children’s best interests and welfare. Santmier v. Santmier, 494 So.2d 95 (Ala. Civ. App. 1986). The factors that enter into the court’s custody determination include the child’s age and sex and each parent’s ability to provide for the child’s educational, material, moral, and social needs. Tims v. Tims, 519 So.2d 558 (Ala. Civ. App. 1987). Likewise, it is proper for the court to consider the “characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and *675 each parent.” Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981).’ ”
Harris v. Harris, 59 So.3d 731, 734-35 (Ala. Civ. App. 2010).
In addition, § 30-3-152, Ala. Code 1975, provides, in pertinent part:
“(a) The court shall in every case consider joint custody but may award any form of custody which is determined to be in the best interest of the child. In determining whether joint custody is in the best interest of the child, the court shall consider the same factors considered in awarding sole legal and physical custody and all of the following factors:
“(1) The agreement or lack of agreement of the parents on joint custody.
“(2) The past and present ability of the parents to cooperate with each other and make decisions jointly.
“(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent,
“(4) Any history of or potential for child abuse, spouse abuse, or kidnapping.
“(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody.
“(b) The court may order a form of joint custody without the consent of both parents, when it is in the best interest of the child.”
In its judgment, the trial court stated the following, in pertinent part:
“In reaching a decision regarding the custody of the [child], the parties stood on an equal footing such that neither parent enjoyed a favorable presumption. The paramount and controlling concern of the Court was the best interest of the child. The Court weighed the age and sex of the parties’ [child]; the [child’s] emotional, social, moral, material, and educational needs; and the characteristics of those seeking custody, including age, character, stability, mental and physical health, and their respective home environments. [The parties] will have joint legal and physical custody of [the child].”
In light of its findings, the trial court’s judgment provided:
“[The parties] will have joint legal custody of [the child]. Both parents will discuss with each other and agree on major decisions concerning the child, including, but not limited to academic, religious, civic, cultural, athletic, and other activities, and in medical and dental care. If the parents are unable to agree on a decision, [the mother] will have the primary authority and responsibility for the final decision.
“[The parties] will have joint physical custody of [the child] in a way that assures the child frequent and substantial contact with each parent. Joint physical custody does not necessarily mean physical custody of equal durations of time.”
The mother testified that, at the time of the trial, she and the child were living at her mother and stepfather’s house in Cor-dova. She stated that, before she filed her divorce complaint, she had been the child’s primary caregiver and that the father had not done “a whole lot” for the child. She said that, pursuant to the trial court’s pen-dente lite order, the child had recently been spending time with each party separately and that she felt that doing so had been “really hard on him,” specifically stating: “He acts out more, his routine is thrown off, he don’t go to bed on time like he did. He’s ill.” She contrasted the child’s behavior during the divorce litigation with his behavior during the parties’ marriage, *676 during which time the child had reportedly-done “[v]ery well.”
The mother opined that awarding her sole physical custody of the child would be in his'best interest. She based her conclusion, in part, on her belief that doing so would provide the child with more stability and a better routine and schedule, stating: “I think he needs one home.” Regarding the parties’ work schedules, the mother testified that the father worked for Alabama Power Company, Inc,, that he usually worked 12-hour shifts, -and that his schedule generally alternated between 3 and 4 workdays each week. She also stated that- he had been required to work additional or different shifts during the pen-dency of the divorce litigation. The mother, however, worked for a pet-grooming and pet-boarding business that she had started, and she characterized her employment schedule as more flexible than the father’s.
Regarding the- parties’ relationship and its impact upon - the child, we note the mother’s testimony regarding the father’s actions that she said had contributed to their divorce: “The way. he talked to me, not helping any, trading trucks all the time, [and] the tax stuff not getting paid like it was supposed to.” She testified that, in the child’s presence, the father had called her “dumb-dumb [and] ignorant” and had said that she “wasn’t worth killing.” She stated that, after hearing the father say those things, the child had be-: gun to call her “dumb-dumb and would use words saying stuff like that.”
The mother also testified that the father had viewed pornography during their marriage. She recounted discovering proof of such activity on the father’s cellular telephone', the father’s initial denial of such activity, - and the father’s later admission that he had done so after she had- confronted him with the proof that she had discovered. She also admitted, however, that she had watched pornography with the father during their honeymoon.
Regarding their ability to cooperate with one another, the mother testified that she and the father had been unable to work together to solve problems related to the child during, their marriage, that they had been unable to do so during the pendency of the divorce litigation, and that she believed that they would be unable to do so in the future. She specifically stated that the parties had .not been able to agree upon the child’s proper shoe size, the clothes that he should wear, or the amount of medicine that he should take; she did not believe that administering the “full dose” of over-the-counter medications to the child was always necessary. However, when asked by the trial court: “Have you shown any abilities in the past to cooperate with [the father] in regards to [the child]?,” she responded: “Yes.” "The mother also admitted that the father is a good father to the child, that he loves the child, and that he takes good care of the child when the child is with him. Although, during the pai-ties’ marriage, the father’s mother had also helped care for the child three days each week while the parties were working, the mother testified that she had not allowed the father’s mother to do so after the parties had separated in October 2015.
The mother testified ’ that she had an extensive support system of friends and family that could help her take care of the child, which included her mother, her grandparents, her sister, her aunts, and her employee. The mother’s mother also testified and corroborated several-aspects of the mother’s testimony, specifically noting that the parties had had disagreements regarding the child and that the father had “mostly talked over [the mother] and wouldn’t let her voice any kind of opinion” during their disagreements. She agreed *677 that the mother had been the child’s primary caregiver during the parties’ marriage, stating: “I never saw [the father] do anything for [the child].” The mother’s grandfather also testified that the mother had been the child’s primary caregiver during the parties’ marriage.
The father testified that he also lived in Cordova, that he was an assistant plant-control operator for Alabama Power, and that he worked 12-hour shifts from 6:00 p.m. until 6:00 a.m., and he stated: “I’m on night shift nightly and I work 4 days one week, off 3 days that week. The next week I work 3, off 4 days that week." Regarding his family, the father testified that his brother, his sister, his parents, and his grandparents had been involved with the child, and he testified generally regarding the positive activities that they had participated in with the child. The father also noted that his parents, and his grandparents were available to assist him with caring for the child and working around his work schedule.
The father testified that, after the child was born, the mother had stopped working for approximately six months in order to care for the child. After that time, the mother’s mother and the father’s mother had volunteered to care for the child, and the parties had created a schedule that provided for the child’s care and location on each day of each week. The father testified that there had never been any problems with the arrangement that the parties had reached.
Regarding the circumstances that contributed to the parties’ divorce, the father testified:
“I made mistakes myself as everybody does, and I’m young. She made mistakes and wouldn’t own up to them and didn’t want to talk about them, and that become a problem that we couldn’t talk and work stuff out.... Like trading trucks. I knew she didn’t really want me to but, you know, she also cosigned on the truck, so it didn’t look like it was that big of a deal .... I usually worked six to seven days a week. And at two different times in the marriage I worked two jobs to provide and keep a nice car and be able to go and do things, and no thankfulness, no thank you, I appreciate what you’re doing or anything like that..,. The porn deal. And I didn’t admit to it at first but when I did, after that, I stopped and I didn’t look at it since.... I’m going to say in the total marriage, we probably watched it ten to fifteen times together.”
The father admitted that the mother had been the child’s primary caregiver during their marriage. He also admitted that he had called the mother dumb and had stated that she “wasn’t worth killing” in front of the child. He said that he understood that saying those things in front of the child did not promote the child’s affection for the mother and that he should not have said them. He agreed that he had become more involved with the child’s care after the mother had filed her divorce complaint than he had been during their marriage.
When asked by his attorney why he believed that the parties should be awarded joint legal and physical custody of the child, the father stated:
“Because both of us are good parents that love [the child], and neither one of us drink or smoke or do anything bad like that, and I think it should be equal for [the child] to see both of us the same amount of time.... When [the child] gets older—my dad coached me all the way through football and I would like to do the same for [the child] and have that bond with him like I had with my own dad.... I want to teach him how to hunt and fish as my dad did and be a good role model and keep him in church *678 and involved in church and drama, choirs like I done when I was younger. That’s about all I can think of.”
Upon questioning by the trial court, the father also testified that he understood that it was important for the child to have a schedule and that he understood the importance of encouraging the child to love the mother.
On appeal, the mother essentially argues that the trial court should have interpreted the evidence presented in particular ways or placed more emphasis on certain portions of the evidence. In support of her argument, the mother has cited Bonner v. Bonner, 170 So.3d 697 (Ala. Civ. App. 2015); D.M.P.C.P. v. T.J.C., 138 So.3d 296 (Ala. Civ. App. 2012); Alexander v. Alexander, 65 So.3d 958 (Ala. Civ. App. 2010); Morgan v. Morgan, 964 So.2d 24 (Ala. Civ. App. 2007); Parker v. Parker, 946 So.2d 480 (Ala. Civ. App. 2006); Gonzalez v. Gonzalez, 908 So.2d 255 (Ala. Civ. App. 2004); Speakman v. Speakman, 627 So.2d 963 (Ala. Civ. App. 1993); Murph v. Murph, 570 So.2d 692 (Ala. Civ. App. 1990); Hall v. Hall, 577 So.2d 469 (Ala. Civ. App. 1990); Cokely v. Cokely, 469 So.2d 635 (Ala. Civ. App. 1985); and Hollingsworth v. Wright, 369 So.2d 18 (Ala. Civ. App. 1979).
In most of those cases, however, this court determined that a trial court had acted within its discretion because the record evidence had supported the trial courts’ decisions regarding custody of the children at issue, and we therefore affirmed the judgments in that regard. Among the cases that the mother has relied upon, we reversed the trial court’s custody determination in only Gonzalez, supra, a plurality opinion that the mother has discussed in greater detail in her appellate brief.
The mother points to the facts of Gonzalez that she contends are “strikingly” similar to the facts of this case, namely that, in that case, the mother had been the children’s primary caregiver, the father, in that case, had only recently become more involved with the children as a result of the divorce litigation, the father had been verbally abusive toward the mother, and the father admitted to having viewed por.nography. Id. at 257-63. However, the trial court in Gonzalez had awarded the father sole physical custody of the parties’ three children, rather than, as in this case, awarding joint physical custody. Id at 257.
In reversing the trial court’s custody determination in Gonzalez, two judges concluded that an award of sole physical custody, the very relief that the mother in this case has requested, to the father was improper based on the evidence that had been presented regarding, among other things, the children’s relationship with the mother. Id. at 263. In other words, the main opinion in Gonzalez does not stand for the proposition that an award of joint custody under those circumstances would have been improper; rather, it stands for the proposition that an award of sole physical custody to the father under those circumstances was improper. As such, this court’s reversal of the trial court’s custody determination in Gonzalez does not compel a conclusion that the trial court’s custody determination in this case should be reversed.
Because “we are ‘charged only with determining whether the evidence was sufficient to support the trial court’s judgment’ and not with determining whether there was a sufficient basis for a different judgment than that entered by the trial court,” we conclude that the trial court acted within its discretion in awarding joint legal and physical custody of the child and that its judgment was not plainly and palpably wrong such that it warrants reversal. Henning v. Henning, 26 So.3d *679 450, 455 (Ala. Civ. App. 2009)(quoting Ex parte Ederer, 900 So.2d 424, 426 (Ala. 2004)). In its judgment, the trial court expressly stated that it had considered the age and sex of the child; the child’s emotional, social, moral, material, and educational needs; and the characteristics of the parties, including their age, character, stability, mental and physical health, and their respective home environments. Based on the evidence presented, the trial court could have determined that, given the child’s young age at the time of trial and the relationship that he had established with the parties and their respective faiqilies, his best interest would be promoted through continuing and regular contact with his paternal and maternal families.
Indeed, although the mother relies upon her testimony regarding the difficulties that the child had experienced during the divorce litigation as evidence of the “disruptive effect” that an award of joint custody would have on the child, the trial court could have viewed that same testimony as evidence indicating that the reduced maintenance of his familial relationships resulting from the parties’ divorce was negatively impacting the child. The trial court could have therefore determined that an award of joint physical custody would continue to foster the child’s established relationships, and therefore his best interest, to the extent possible in light of the practical realities of the parties’ divorce. Furthermore, we also note that the evidence presented would have supported a finding by the trial court that each party was capable of adequately caring for the child and providing for his needs. Thus, we conclude that the trial court’s resolution of the factors set forth in its judgment is supported by the record and does not warrant reversal.
We next consider each of the factors enumerated in § 30-3-152(a), Ala. Code 1975. First, the parties did not agree on joint custody. Second, although the mother testified that the parties were unable to cooperate and make decisions jointly, her testimony was disputed by the father, and, when questioned by the trial court, the mother conceded that the parties had been able to cooperate in the past. Third, the evidence presented would have supported a finding that each party regarded the other as a good parent and that the parties were therefore capable of encouraging love, affection, and contact between the child and the other parent. Fourth, no evidence was presented regarding any history of abuse, domestic violence, or kidnapping. Fifth, the parties both testified that they were living in Cordova at the time of the trial. In light of the foregoing, we cannot conclude that the factors enumerated in § 30-3-152(a) foreclosed the trial court’s award of joint custody under § 30-3-152(b), Ala. Code 1975, and its judgment cannot be reversed for that reason.
We next turn to the mother’s argument that the trial court’s judgment should be reversed because it incorrectly calculated the father’s child support. Citing Mosley v. Mosley, 770 So.2d 638, 641 (Ala. Civ. App. 2000), the mother specifically contends that the trial court erred because its calculation deviated from' the Rule 32, Ala. R. Jud. Admin., guidelines without explaining the reason for its deviation. See also Hayes v. Hayes, 949 So.2d 150, 154 (Ala. Civ. App. 2006). Regarding the parties’ incomes and child support, the trial court’s judgment stated: “[The mother] ... is employed ... making . approximately $2,167.00 per month. [The father] is employed ... with a monthly income of $6,944.00.... [The father] will pay [the mother] $458.00 in child support .... The child support amount is in accordance with Rule 32[, Ala. R. Jud. Admin.].” The record also contains a copy of a completed Form CS-42 that indicates that it was *680 prepared by the trial court on the day of the trial. In that document, the trial court noted that the mother’s monthly gross income was $2,167, that the father’s monthly gross-income was $6,649, and that the father’s recommended child-support obligation was therefore $713.34 after an adjustment for the father’s monthly $157 payment of health insurance for the child.
In his appellate brief, the father also states: “The trial court’s award of child support does not appear to comply with Rule 32[, Ala. R. Jud. Admin.]; therefore[,] this case should be remanded to the trial court- in order for it, to properly determine the correct amount of the father’s child support obligation in accordance with said rule.” We note that the amount of the father’s income is recorded differently in the trial court’s judgment .and’in its Form CS-42. However, application of the Rule 32 guidelines using either figure would result in an award of child support greater-than the $458 set forth in the trial court’s judgment.
Therefore, we must reverse the trial court’s child-support award, and we remand .this cause for the trial court to properly determine the father’s child-support obligation in compliance with Rule 32, Ala. R. Jud. Admin. “The trial court may, in its discretion, compute the obligation according to the guidelines or expressly state the reasons why a deviation from the guidelines is necessary in this case.” Hayes, 949 So.2d at 154-55. In. all other respects, the trial court’s judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.