THOMPSON, Presiding Judge.
Kelly Renee Sims (“the mother”) appeals from a judgment of the Limestone Circuit Court divorcing her from Jason Pepper Sims (“the father”). For the reasons set forth herein, we affirm the judgment in part and reverse it in part.
The parties were married in July 2000, and they are the parents of two children. At the time of the trial in this action, the children were ages 11 and 6.
On May 13, 2009, the father filed a divorce action against the mother. The parties each sought pendente lite relief. On July 1, 2009, the trial court, after holding a hearing, entered an order awarding the parties joint legal custody of the children, awarding the father sole physical custody of the children, and awarding the father exclusive possession of the marital residence during the pendency of the action. Thereafter, the mother filed a motion to hold the father in contempt for violating the July 1, 2009, order.
On November 18, 2009, a trial was held in the action. Evidence submitted at that trial indicated that the mother had been an officer of the parent-teacher organization (“the PTO”) at the elementary school at which she also served as a substitute teacher and that the children attended. In March 2009, while serving in that role, she made personal expenditures of approximately $1,100 using a PTO credit card. The improper charges on the PTO credit card included purchases of gasoline, groceries, and clothing. The mother also made cash withdrawals with the PTO credit card. The mother entered into an agreement to repay the $1,100 in two equal payments, with one payment due March 31, 2009, and the other payment due April 30, 2009. The mother paid only $200 on March 31, 2009, and the principal of the elementary school thereafter contacted the sheriffs office about the situation. The principal also contacted the father, who, it is undisputed, had had no knowledge of the situation. The principal removed the mother from the list of substitute teachers at the school. He also informed the board of education of the situation, and the mother was removed from the list of substitute teachers for the entire county school system. The mother paid the balance of the missing funds on May 14, 2009. The mother testified that her misuse of the credit card was accidental and that it had *409 occurred because the PTO credit card resembled her personal debit card.
The father was a police officer with the City of Madison. The father submitted into evidence a CS^l “Child-Support-Obligation Income Statement/Affidavit” form that indicated that he earned $4,188 monthly from his employment as a police officer and that he paid for health, dental, and vision insurance that covered the children. He worked the third shift, from 9:80 p.m. to 5:30 a.m. He testified that he was seeking to. move to the day shift, which would involve working from 6:00 a.m. to 2:00 p.m.
In addition to his job as a police officer, the father farmed 60 acres of land that his grandmother owned. He testified that he started farming so that he could provide more for his family and that he had been doing so for four years. He stated that when he went to the farm, it was typically in the evenings and that he earned approximately $20,000 in income in the year preceding the trial from farming.
The father testified that, before he and the mother separated, he would arrive home from work a little after 6:00 a.m. and help prepare the children for school. He testified that sometimes he would take the children to school and that sometimes the mother would do so. He stated that, after he was awarded pendente lite custody of the children, he took them to school and picked them up from school every day. In later testimony, the father admitted that his sisters often picked up the children from school and that one of his sisters worked at the school.
The father stated that, on the five evenings he worked each week, he left for work after the children had gone to bed and that his mother would stay with the children overnight. He stated that the children usually spent Saturday evening at his mother’s house.
The father testified that the parties had had financial problems during the marriage. He stated that the mother would obtain credit cards without his knowledge and that, on three or four occasions, he had had to pay off several bills. He testified that he would find bills from creditors he did not know existed. It is undisputed that the mother incurred credit-card debt and debts at several stores about which the father testified he had had no knowledge and that she had written bad checks. The father testified that the mother was not truthful with him concerning how she spent money.
The father testified that both of the children had savings accounts and that, on one occasion, the mother, without his knowledge, withdrew $400 to $500 from the older child’s account. The father testified that he did not know how the mother had spent that money. The mother testified that she had withdrawn approximately $800 from the older child’s savings account and that she had given that money to her parents to pay them back for a suit they had purchased for the father for his father’s funeral. She stated that she told the father about the purpose of the withdrawals after he had found out about them and that he asked her not to do it anymore.
The father testified that the older child had participated in an accelerated reading program for the four previous school years but that the child was not presently participating in it. The father stated that the younger child had participated in cheer-leading and tumbling during the previous school year but that she was not participating in those activities during the present year. He admitted that, since he had been awarded pendente lite custody of the children, the younger child had not participated in any after-school activities. He *410 testified that, if he were able to move to the day shift at work, he hoped that the children would be able to participate in after-school activities again.
The mother testified that if she obtained physical custody of the younger child, she would allow the child to participate in gymnastics, cheerleading, and baseball. She testified that if she were awarded custody of the older child, he would begin participating in the accelerated reading program again.
The father testified that, since he has had the children in his custody, he decided on one or two days not to give the older child the medication that had been prescribed for him for attention-deficit/hyperactivity disorder (“ADHD”). The father stated that he did not see a difference in the child physically or behaviorally when the child did not receive his medication. He testified that he did not think the child should be on medication for ADHD and that he planned to seek a second opinion from another doctor with regard to the child’s ADHD diagnosis.
He also stated that, since he had been awarded pendente lite custody of the children, he had taken them to the dentist, which was the first time in several years the children had been to the dentist.
Although the testimony was not entirely clear, it appears that, since the children had been in the father’s custody, the older child, who was in the fifth grade, had made a “C” in his mathematics class and that he had never made a “C” in the past. The father testified that the younger child, who was in the first grade at the time of the trial, had made all “As” on her first progress report but that she had made “Bs” and a “C” on the second progress report. The father testified that the mother had not spent more time helping the children with their homework before the parties’ separation than he was presently spending helping the children with their homework. However, he also testified that the older child usually completed all of his homework before he came home from school.
The mother testified that she had been the primary caregiver for the children during the marriage. She stated that she was concerned that the older child had received a “C,” and she stated that that child required that someone make sure he completed his homework. She stated that, before she left the marital home, she would sit down with the older child every night and go over his assignments from school with him. She stated that, if she obtained custody of the older child, she would encourage him to do his math homework at home at night and that she would participate with him in studying at night.
At the time of the trial, the mother was employed as a substitute teacher with the Madison City Schools and testified that she had submitted numerous applications for other employment. The mother testified that she earned approximately $700 monthly, and she submitted into evidence a CS-41 form reflecting that income. In addition to working as a substitute teacher, the mother had previously held a part-time job at a veterinary clinic; she was fired from that job. She also had held a part-time job with an insurance agent; she testified that that job ended because the agent had wanted her to begin working more hours. The mother testified that she did not work very much during the marriage because the parties had agreed that she primarily would be a stay-at-home mother.
The mother testified that the father had been “physical” with her on two occasions. She stated that, on one occasion, he pushed her into the wall of a hallway and that, on the second occasion, he had pushed her into the door of their bedroom. *411 The father admitted that those incidents had occurred, and, in addition, that he had grabbed the mother’s wrist on one occasion.
The older child testified in camera during the trial. His testimony contradicted much of the mother’s description of her role as a parent.
On November 25, 2009, the trial court entered an order divorcing the parties. Among other things, the trial court awarded the parties joint legal custody of the children, awarded the father sole physical custody of the children, awarded the mother visitation with the children, and required the mother to pay child support in the monthly amount of $317. The mother appealed. This court dismissed the appeal because the trial court’s judgment left unresolved the mother’s motion to hold the father in contempt. See Sims v. Sims, 60 So.3d 306, 307 (Ala.Civ.App.2010) (citing Meek v. Meek, 54 So.3d 389, 392-93 (Ala.Civ.App.2010)). Following the dismissal of that appeal, the trial court entered an order denying the mother’s contempt motion. With that motion resolved, the mother filed the present appeal.
The mother contends that the trial court exceeded its discretion in awarding physical custody of the children to the father. She argues that she had been the children’s primary caregiver during the marriage and that, by awarding custody of the children to the father, the trial court had, in effect, awarded custody of the children to their paternal grandmother, upon whom the primary responsibility for raising the children would fall. She points out that, while in the father’s pendente lite custody, the children’s grades had declined and that the father had decided to “usurp medical advice and make decisions regarding the efficacy of giving the [older child] his prescribed medication.”
The standard by which this court reviews an initial award of custody following the presentation of ore tenus evidence is well settled:
“ ‘When this Court reviews a trial court’s child-custody determination that was based upon evidence presented ore tenus, we presume the trial court’s decision is correct: “ ‘A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....’” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. “In child custody cases especially, the perception of an attentive trial judge is of great importance.” Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, this Court has also stated: “It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.” Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).’
“Ex parte Fann, 810 So.2d 631, 632-33 (Ala.2001).
“In a divorce action between two fit parents, where there has been no prior custody determination and neither parent has voluntarily relinquished custody of the child, the ‘best interest’ of the child is controlling; the parties stand on *412 ‘equal footing’ and no presumption inures to either parent. ‘ “ ‘The trial court’s overriding consideration is the children’s best interest and welfare.’ ” ’ Smith v. Smith, 727 So.2d 113, 114 (Ala.Civ.App.1998) (quoting Collier v. Collier, 698 So.2d 150, 151 (Ala.Civ.App.1997), quoting in turn Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994)).
“In considering the best interests and welfare of the child, the court must consider the individual facts of each case:
“ ‘The sex and age of the children are indeed very important considerations; however, the court must go beyond these to consider the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose.’
“Ex parte Devine, 398 So.2d 686, 697 (Ala.1981).”
Fell v. Fell, 869 So.2d 486, 494-95 (Ala.Civ.App.2003).
Given all the evidence offered at trial, we cannot conclude that the trial court’s decision to award the father custody of the children was plainly and palpably wrong. The evidence was conflicting at trial on several matters, and it is the province of the trial court, not of this court, to weigh that evidence and to make credibility determinations. We note evidence in the record from which the trial court could have determined that the mother was reckless with regard to managing finances; that she had, in effect, misappropriated money from the PTO at her children’s school, of which she was an officer; and that she had lost more than one job within the recent past and had failed to obtain full-time employment between the time the father had been awarded pendente lite custody in July 1, 2009, and the trial on November 18, 2009, holding, instead, a part-time job as a substitute teacher making only $700 per month, despite having a college degree. We have also considered the testimony of the older child, which, as noted, contradicted much of the mother’s description of her role as a parent.
As part of her argument that the trial court should not have awarded custody of the children to the father, the mother argues that the father admitted to pushing the mother on two occasions and grabbing her wrist on one occasion. Thus, she argues, the Custody and Domestic or Family Abuse Act, § 30-3-130 et seq., Ala.Code 1975 (“the Act”), creates a presumption that it was not in the children’s best interest for the trial court to award custody of them to the father. We disagree.
Section 30-3-131 provides:
“In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal *413 custody, or joint physical custody with the perpetrator of domestic or family violence. Notwithstanding the provisions regarding rebuttable presumption, the judge must also take into account what, if any, impact the domestic violence had on the child.”
The trial court did not make an express determination as to whether domestic or family violence had occurred such that there was a presumption against the award of custody of the children to the father. As previously noted, in the absence of fact findings by the trial court, this court will assume that the trial court made those findings necessary to support its judgment. See Fell, supra.
In the present case, the trial court could have determined, based on the evidence, that the physical acts of which the mother complains did not rise to the level of domestic or family violence as defined by the Act, see § 30-3-130, and, as a result, that there was no basis in this case for the application of the presumption called for in the Act. See McCormick v. Ethridge, 15 So.3d 524, 530-31 (Ala.Civ.App.2008) (holding that trial court was authorized to conclude that father’s forceful shove of mother’s son in the chest and father’s pushing mother and thereby causing her to lose her balance and fall did not constitute domestic or family violence under the Act). Alternatively, the trial court could have concluded that the presumption called for in the Act, although applicable, was rebutted by a lack of evidence indicating that the father’s actions had negatively impacted the children. See id. at 531. Thus, the mother’s argument fails to support a reversal of the trial court’s judgment with regard to the custody of the children.
The mother also contends that the evidence does not support the amount of child support the trial court ordered her to pay to the father, and she notes that the trial court did not prepare a CS-42 “Child-Support Guidelines” form as required by Rule 32, Ala. R. Jud. Admin. We agree. In Hayes v. Hayes, 949 So.2d 150 (Ala.Civ.App.2006), this court wrote:
“The father’s only remaining contention is that the trial court failed to utilize the required child-support-guidelines forms in making its determination of the amount of prospective child support owed by the father. This court has held that if the record does not reflect compliance with Rule 32(E), Ala. R. Jud. Admin, (which requires the filing of ‘Child Support Obligation Income Statement/Affidavit’ forms (Forms CS-41) and a ‘Child Support Guidelines’ form (Form CS-42)), and if child support is made an issue on appeal, this court will remand (or reverse and remand) for compliance with the rule. See Martin v. Martin, 637 So.2d 901, 903 (Ala.Civ.App.1994). On the other hand, this court has affirmed child-support awards when, despite the absence of the required forms, we could discern from the appellate record what figures the trial court used in computing the child-support obligation. See, e.g., Dunn v. Dunn, 891 So.2d 891, 896 (Ala.Civ.App.2004); Rimpf v. Campbell, 853 So.2d 957, 959 (Ala.Civ.App.2002); and Dismukes v. Dorsey, 686 So.2d 298, 301 (Ala.Civ.App.1996). Nevertheless, without the child-support-guidelines forms, it is sometimes impossible for an appellate court to determine from the record whether the trial court correctly applied the guidelines in establishing or modifying a child-support obligation. See Horwitz v. Horwitz, 739 So.2d 1118, 1120 (Ala.Civ.App.1999).”
949 So.2d at 154-55.
In the present case, the parties submitted CS-41 forms indicating that the father earned $4,188 monthly and that the mother earned $700 monthly. The record also *414 indicated that the father earned income from his farming activities. The record does not contain a CS^2 form setting forth the proper allocation of child support between the parties. Utilizing the figures contained in the parties’ CS-41 forms does not result in a child-support award in the amount ordered by the trial court. Although a trial court can deviate from the child-support guidelines contained in Rule 32, Ala. R. Jud. Admin., it is required to make a “written finding on the record indicating that the application of the guidelines would be unjust or inappropriate.” Rule 32(A). The trial court made no such written finding in the present case. We also recognize, as the father argues, that a trial court is permitted to impute income to a parent who is voluntarily unemployed or underemployed. See Rule 32(B)(5). However, in the present case, the evidence does not support the imputation of income to the mother in an amount necessary to result in the amount of child support the trial court awarded in this case.
Because the award of child support in this case did not comply with Rule 32, Ala. R. Jud. Admin., and because we cannot discern from the record the basis for the amount of child support the trial court awarded, we must reverse that portion of the judgment setting the mother’s child-support obligation and remand the cause to the trial court for the entry of a judgment that complies with Rule 32. In all other respects, the final judgment is due to be affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.