PITTMAN, Judge.
This is the second time these parties have been before this court. In the first appeal, which we dismissed as having been taken from a nonfinal order, we recounted the procedural history of the case as follows:
“On September 11, 2007, the Coving-ton Circuit Court entered a ‘Judgment of Divorce’ in case no. DR-06-306, purporting to divorce D.M.P.C.P. (‘the mother’) and T.J.C., Jr. (‘the father’); to divide their marital assets and debts; to reserve the issues of custody, support, and visitation regarding the parties’ minor child, T.J.C. III, until the conclusion of the criminal proceedings then pending against the father for sexual abuse of S.G., the mother’s minor [daughter] by a former marriage; and to direct the entry of a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. The circuit court further awarded pendente lite custody of T.J.C. III to the mother,[1]⅛ granted the *298 father visitation rights, ordered the father to pay pendente lite child support, and ‘reserved jurisdiction to hold ... further hearings ... upon written motion of either party.'
“In January 2009, the father sought a hearing on the reserved issues of custody, support, and visitation, alleging that he had been acquitted of the criminal offense. Following ore tenus proceedings [in February 2010], the circuit court entered a ‘Final Decree Concerning Child Custody, Visitation, and Support’ on July 30, 2010, awarding custody of T.J.C. III to the father; ordering the mother to pay child support; determining that the father was in arrears in the payment of pendente lite child support; and reserving jurisdiction to ‘set the exact amount thereof in some future proceedings.’ ”
D.M.P.C.P. v. T.J.C., 91 So.3d 75, 76 (Ala.Civ.App.2012). After the first appeal was dismissed, the parties agreed that T.J.C., Jr. (“the father”), owed a pendente lite child-support arrearage in the amount of $850, and the trial court entered a judgment awarding D.M.P.C.P. (“the mother”) that sum on April 11, 2012. The mother timely appealed, challenging the custody award to the father.

Factual Background

At the time of the custody hearing in February 2010, the father was living in his parents’ home, a three-bedroom house in the Fleeta community near Opp, and was employed full-time at Reliable Products Company in Geneva. The mother was living in her parents’ home, a four-bedroom house in Milton, Florida, with her fiancé, who is a United States Air Force retiree, and her three children: S.G., a 13-year-old daughter; D.G., an 11-year-old son— both from the mother’s previous marriage; and T.J.C. Ill (“the child”). The mother was employed part-time by the local school board as a substitute teacher’s aide and clerical worker; she was also a student at Pensacola Junior College.
The mother had had pendente lite custody of the child, who was then approaching his sixth birthday, for three and a half years. The father had been exercising twice-monthly weekend visitation with the child during the pendency of the custody proceedings. The parties had been meeting in Crestview, Florida, for the visitation exchanges.
The evidence indicated that the child is good-natured, well-mannered, and shy. He has his own room when he visits at the paternal grandparents’ house, but he is somewhat fearful and prefers to sleep in the father’s room, where he has a separate bed. The child has one playmate near his own age in the paternal grandparents’ neighborhood. On the weekends when he has visitation with the child, the father prepares the child’s breakfast and lunch, plays with him, and takes him to the small Methodist church where the father’s family members have long been active. The paternal grandmother stated that, if the father were awarded custody of the child, she would care for the child at times when the father is at work.
In addition to her parents, the mother has a large extended family in Milton, including cousins near the same age as the child. The mother’s parents, like the father’s parents, are retired. The maternal *299 grandparents’ yard is the place where all the neighborhood children, including the child’s two best friends, congregate to play. The mother said that, although she had offered to drive the child to school, the child prefers to rise early and fix his own breakfast so that he can ride the school bus with his neighborhood friends and his half brother. The child shares a room with the half brother and, according to the mother, the two are very close despite the five-year difference in their ages. The mother said that when the child’s half siblings had visited their father in Texas the child had missed them a great deal.
The child enjoys soccer and has participated in a church soccer league for the past two years. The mother attends some but not all the child’s soccer games because she coaches her daughter’s soccer team. The mother is vice president of the middle-school parent/teacher organization and has been a Scout leader. According to the child’s kindergarten teacher, the mother volunteers on a regular basis at the child’s elementary school and is always willing to help with activities. The kindergarten teacher testified that the schools in Florida, where she had been teaching for 23 years, have a more demanding academic curriculum than the schools in Alabama, where she had been born and raised. She stated that the child is an average student who had struggled to catch up after he had missed school on several Mondays at the beginning of the current term.[2] The teacher stated that the child speaks favorably of both his father and the mother’s fiancé, and it is evident, she said, that the child is “very much loved.” Over the mother’s objection, the teacher was allowed to state her personal opinion that “a child should be brought up in a church environment.”
On cross-examination by the father’s counsel, the mother was asked how her fiancé (whom she stated was the same age as she) could retire from the military at the age of 35. The mother responded that her fiancé had been diagnosed with terminal Parkinson’s disease and had received a medical retirement. Opposing counsel then questioned the mother as to whether she thought she was “sending the wrong signal to [her] children with [her fiancé] living in [the] household and being in the bed with [her] at night.” The mother was also asked on cross-examination whether the child attended church when he was with her. The mother stated that she considered herself a Christian but that she had not taken the child to church for “about a year” because she had not found a church in which she was comfortable.
The mother’s fiancé testified that the maternal grandparents had allowed him to move into their home in June or July of 2009 after he and his former wife had divorced. At that time, he said, he and the mother were friends and he had slept on the couch. Six months later, he said, he and the mother developed a romantic and sexual relationship, and they currently had plans to marry. The fiancé stated that he loved the child “as if [the child] were [his] own.”
The trial court’s custody award states:
“The care, custody and control of said child should be, and it hereby is, awarded unto [the father], to be exercised in the home of his parents, wherever they *300 may elect to reside. Scarlan v. Rowinsky, 611 So.2d 1092 (Ala.Civ.App.1992).
“The Court has, of course, considered an award of joint custody as required by Ala.Code § 30-3-152, but it thereupon awards the form of custody determined - to be in the best interests of the parties’ child, which is always the court’s primary concern.
“Obviously, the above award of custody does represent an alteration of the temporary custodial status heretofore existing. However, the benefits thereof unto the child outweigh any disruption in his life caused by the alteration, and such alteration will likewise materially promote his best interests.
“Moreover, there have been material changes in the circumstances of the parties since the temporary custody orders (superseded hereby) came into effect, and those changes are sufficient to justify the Court in proceeding as it does in this decree.”

Standard of Review

The mother suggests that a deferential standard of review is inappropriate in this case because almost six months elapsed between the custody hearing and the trial court’s custody order of July 30, 2010, during which time, she says, the trial court “could not remember the testimony ... and listened to tape recordings of the trial.” There is no indication in the record that the trial court was unable to remember the trial testimony. The July 30, 2010, order merely states: “The court, in order to gain a greater grasp of the issues, has again listened to the entire testimony as presented on February 9, 2010, having done so by resort to the court reporter’s tape recordings thereof.” We conclude that our standard of review is as stated in Ex parte Fann, 810 So.2d 631, 633 (Ala.2001):
“When [an appellate court] reviews a trial court’s child-custody determination that was based upon evidence presented ore tenus, we presume the trial court’s decision is correct: ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....” ’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, this Court has also stated: ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).”

Discussion

The mother raises several arguments on appeal that can be distilled into four issues, namely: (I) whether the father was required to meet the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984), in order to be awarded custody of the child; (II) whether the trial court erroneously ignored evidence that was adverse to the father and gave undue weight to evidence that it perceived to be adverse to *301 the mother; (III) whether the trial court’s judgment is flawed because it requires the father to exercise his custodial rights in the home of the paternal grandparents; and (IV) whether the trial court’s judgment withstands scrutiny under a “best-interests” standard. We will address those issues in turn.
I.
Citing Rich v. Rich, 887 So.2d 289 (Ala.Civ.App.2004), the mother contends that, despite the language of the September 11, 2007, order awarding her “pendente lite” custody, the trial court evidently (and, she says, correctly) considered the award to be one of “temporary” custody to which the McLendon standard applied. The mother further contends that the father did not meet the McLendon standard.
Rich is distinguishable. The successive custody awards in that case were awards of “temporary” custody — or “permanent custody subject to change,” Ex parte J.P., 641 So.2d 276, 278 (Ala.1994) — because they “were not made with the ‘pendency of the [existing] litigation’ in mind.” Rich, 887 So.2d at 300 (quoting J.P., 641 So.2d at 278).
“Instead, each of those judgments was a custody award made by the trial court in such a manner as to allow more facts to be developed — i.e., to allow a trial period with the custodial parent and to make it possible to base any subsequent change in custody on the history of the parties’ relationships that developed during that period.”
Rich, 887 So.2d at 300. In contrast, the September 11, 2007, order in the present case was a pendente lite custody award because it was made with the pendency of the existing litigation in mind — litigation that awaited only the resolution of criminal charges against the father and not the development of new facts regarding the parties’ relationships.
The mother argues that the trial court’s statement in its September 11, 2007, order that the court would set a hearing and render a custody judgment “upon written motion of either party” actually makes the pendente lite custody award a “ ‘prior judicial decree’ for purposes of McLendon,” Rich, 887 So.2d at 300, because, she says, the trial court’s language suggested that the' September 11, 2007, custody award was final unless either party was successful in petitioning for its modification. We disagree. The September 11, 2007, order states:
“[T]he Court reserves jurisdiction to hold a further hearing or hearings with respect to the matters set out below, and to then render the ultimate judgment thereon as the evidence may warrant. It will go forward and do so upon written motion of either party.”
The trial court’s statement that it would set a hearing and “render the ultimate judgment ... as the evidence may warrant” indicates that the trial court recognized that it had not yet entered a final custody award and that a hearing on the matter would be set upon notification by either party that the father’s criminal charges had been resolved.
The mother next argues that the present case should be governed by the McLendon standard because of the passage of time. She points out that the September 11, 2007, custody award remained in “ effect for three and a half years — two-thirds of the child’s life.
“[PJendente lite orders ... do not activate the McLendon rule.” Sims v. Sims, 515 So.2d 1, 3 (Ala.Civ.App.1987).
“If there has been a grant of primary physical custody to one party, then McLendon applies; if not, the ‘best interest’ standard applies. Ex parte *302 Couch, 521 So.2d 987 (Ala.1988). The [September 11, 2007,] order did not activate the McLendon rule, because it was a pendente lite order. ‘[A] pendente lite order, whether entered ex parte or after notice and hearing, clearly envisions a temporary disposition of custody pending a later final determination of the custody dispute.’ Sims v. Sims, 515 So.2d 1, 2 (Ala.Civ.App.1987). The [September 11, 2007,] order indicates that the [mother] was granted custody pending trial, after which the court would make a final determination regarding custody. Tt is well settled that a pen-dente lite order changing custody does not shift the burden of meeting the McLendon standard to the parent who temporarily loses custody by virtue of that order. See T.L.L. v. T.F.L., Jr., 580 So.2d 1359 (Ala.Civ.App.1991); Sims v. Sims, 515 So.2d 1 (Ala.Civ.App.1987).’ D.P.M. v. D.B., 669 So.2d 191, 194 (Ala.Civ.App.1995).”
C.M.L. v. L.S.M., 680 So.2d 375, 377 (Ala.Civ.App.1996).
This court has previously rejected the argument that the passage of time between the entry of a pendente lite custody order and the final custody award somehow shifts to the noncustodial parent the burden of meeting the McLendon standard. See Grant v. Grant, 820 So.2d 824, 825 (Ala.Civ.App.2001).
To the extent that the trial court purported to apply the McLendon standard, it erred. Such error was, however, harmless, because, as we discuss infra, the trial court’s judgment is due to be affirmed under the less stringent best-interests standard. See Rehfeld v. Roth, 885 So.2d 791, 795 (Ala.Civ.App.2004) (stating that any error in applying the McLendon standard to a custody-modification petition was harmless error because the trial court’s determination that the petitioner had satisfied the McLendon standard necessarily meant that the petitioner had met the best-interests standard); I.M. v. J.P.F., 668 So.2d 843, 845 (Ala.Civ.App.1995) (noting that “the trial court applied the McLendon standard ... rather than the ‘best interest’ standard, but because the McLendon standard is more stringent, the trial court’s error in that regard is harmless”).
II.
The mother argues that the trial court ignored evidence indicating (a) that the father had violated previous orders to pay pendente lite child support and to deliver certain personal property to her; (b) that the father had to be served with a petition to modify the visitation schedule before he agreed to return the child to the mother’s custody in time to begin kindergarten on Monday morning, August 24, 2009, and for several Mondays after that; and (c) that it was not in the best interests of the child to separate him from his half siblings. The mother also argues that the trial court accorded undue weight to the presence of her fiancé in the household and to her irregular church attendance.
The trial court did not ignore evidence indicating that the father had failed to pay pendente lite child support. This court dismissed the mother’s first appeal because the trial court had, in fact, expressly determined that there was a child-support arrearage but had failed to determine the amount of the arrearage. See D.M.P.C.P. v. T.J.C., 91 So.3d at 76. The parties’ agreement as to the amount of the arrear-age resulted in the rendition and entry of the trial court’s judgment on April 11, 2012.
Nor did the trial court ignore evidence indicating that the father had failed to deliver certain items of personal property to the mother. The father acknowledged *303 at the beginning of the trial in February 2010 that he had neglected to transfer the property to the mother and stated that he had brought the property with him that day to deliver to the mother. The trial court could have concluded that both issues about which the mother now complains had been resolved to the mother’s satisfaction and should not have figured predominately in the court’s child-custody determination.
The mother argues that the father offered a “lame excuse” for failing to return the child from visitation periods so that the child could attend kindergarten at the beginning of the 2009-2010 school term. The father testified that he had not known when the school year started in Florida and that, when he had learned that the child had missed school on Mondays when the father had been exercising his visitation rights, he had agreed to modify the visitation schedule because to do otherwise would, he said, “mess up [the child’s] academics.” The trial court was entitled to give the father, a first-time parent of a school-age child and one with whom the mother had not regularly communicated about issues concerning the child, the benefit of the doubt on this issue. “[I]t is the province of the trial court, not of this court, ... to make credibility determinations.” Sims v. Sims, 85 So.3d 407, 412 (Ala.Civ.App.2011).
The mother’s arguments with respect to separating the child from his half siblings and weighing against her the facts that she was cohabiting with her fiancé and not regularly attending church present more serious issues, but they are issues for which the trial court had the prerogative to weigh the evidence as it saw fit within the limits of its discretion.
“A determination as to the weight to be given testimony presented to a trial court while that court is sitting as a trier of fact is fully within the discretion of the court since one of the primary functions of a trier of fact is to weigh the evidence before it and reach its conclusions according to the weight given to each portion of evidence presented.”
Stewart v. Stewart, 354 So.2d 816, 821-22 (Ala.Civ.App.1977). It is within the province of the trial court to “‘assign such weight to various aspects of the evidence as it reasonably may have deemed appropriate.’” Vestlake Cmtys. Prop. Owners’ Ass’n v. Moon, 86 So.3d 359, 367 (Ala.Civ.App.2011) (quoting Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala.Civ.App.2005)). “ ‘In order to reverse the trial court ..., ... we would have to reweigh the evidence, ... which we are [not] allowed to do.’ ” Id.
In Ex parte Devine, 398 So.2d 686 (Ala.1981), our supreme court held that, in determining the best interests and welfare of a child, the trial court must consider the individual facts of each case:
“[T]he court must ... consider the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose.”
*304 398 So.2d at 696-97. Based on Devine, the trial court was authorized to consider, among other factors, the “moral ... needs” of the child, “the respective home environments offered by the parties,” and “the capacity ... of each parent to provide for the ... moral needs of the child[ ].” Id.
The mother cites authority standing for the proposition that a parent’s sexual misconduct may not serve as a factor that triggers a change in custody when the record lacks any evidence indicating that the misconduct has had a detrimental effect on the child. The cases cited by the mother — Wade v. Clark, 564 So.2d 982 (Ala.Civ.App.1990), and Smith v. Smith, 464 So.2d 97 (Ala.Civ.App.1984) — concern actions seeking to modify an initial custody award. The mother cites no authority indicating that a parent’s sexual misconduct may not be considered as a factor in making an initial custody award unless that conduct is shown to have had a detrimental effect on the child. In fact, our caselaw suggests that the trial court may, in an initial custody determination, consider a parent’s sexual conduct as it relates to that parent’s character, without a showing that the conduct has been detrimental to the child. See Headrick v. Headrick, 845 So.2d 823 (Ala.Civ.App.2002) (holding that evidence supported custody award of three-year-old child to husband, despite the fact that wife had been child’s primary caretaker, when wife committed adultery and became pregnant with paramour’s child before she separated from husband); Graham v. Graham, 640 So.2d 968 (Ala.Civ.App.1994) (indicating that the trial court could consider, in making an initial custody determination, that the wife had committed adultery during the course of the marriage); and Bates v. Bates, 678 So.2d 1160, 1162 (Ala.Civ.App.1996) (stating that a trial court may consider, among other things, a parent’s character when deciding issue of custody).
III.
The mother maintains that the trial court’s judgment is flawed because it requires the father to exercise his custodial rights in the home of the paternal grandparents, who were nonparties to the divorce action. In support of that portion of its judgment, the trial court cited Scanlan v. Rowinsky, 611 So.2d 1092 (Ala.Civ.App.1992), a case in which the same trial judge awarded custody to a father, conditioned on his exercising custody in the home of the paternal grandmother. The mother contends that Scanlan is distinguishable because both sets of grandparents had been made parties to the divorce action in that case, whereas the paternal grandparents were not made parties to the divorce proceeding in this case. Accordingly, she argues, the trial court’s judgment in the present ease represents a de facto custody award to a nonparty that violated her right to due process of law.
Neither Scanlan nor the present case represents a custody award to a grandparent. In each case, the father alone was awarded custody. The party status of the grandmother in Scanlan is a distinction without a difference. That is so because neither the custody award in Scanlan nor the custody award in this case ordered a grandparent to do or refrain from doing anything. The conditional award in Scanlan was based on the father’s “military position and the uncertainty such position carries with it.” 611 So.2d at 1094. The conditional award in the present case was apparently based upon evidence indicating that the father was unavailable to care for the child between the hours of 5:00 a.m. when he left for work and 4:80-5:00 p.m. when he returned from work.
IV.
The mother contends that the custody award to the father cannot be upheld *305 even under a best-interests standard. First, she says, the trial court erroneously rejected the option of awarding the parties joint custody. The trial court had an evi-dentiary basis to discount joint custody as a viable alternative because the parties had a past history of being unable to communicate with each other, see § 30-3-152(a)(2), Ala.Code 1975, and their residences were not in close geographic proximity to each other, see § 30-3-152(a)(5), Ala.Code 1975.
“Because this was an initial custody determination, where the parties are on equal footing and the trial court must base its decision on what it determines would be in the best interest of the child, our review is very limited.” Headrick, 845 So.2d at 825 (citation omitted). When the trial court makes no specific findings of fact, an appellate court must assume that the trial court made the findings necessary to support its judgment, unless such findings would be clearly erroneous, Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996), and the appellate court will reverse the trial court’s judgment only if it is found to be plainly and palpably wrong, Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). Based on the record before us, we cannot conclude that the trial court’s judgment was plainly and palpably wrong. “This court is not at liberty to set aside the judgment of the trial court merely because we might have decided differently had we been sitting as the trial judge.” Ethridge v. Ethridge, 360 So.2d 1005, 1008 (Ala.Civ.App.1978). “ ‘To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.’ ” Perkins, 646 So.2d at 47 (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)).
The judgment of the Covington Circuit Court is affirmed.
AFFIRMED.
THOMAS, J., concurs.
BRYAN, J., concurs in the result, with writing, which THOMPSON, P.J., and MOORE, J., join.

. The September 11, 2007, order states:
“The [custody, support, and visitation] terms of this order, however, are only pen- *298 dente lite in nature, and are, by mutual consent, not to be considered final. In that connection the Court reserves jurisdiction to hold a further hearing or hearings with respect to the matters set out below, and to then render the ultimate judgment thereon as the evidence may warrant. It will go forward and do so upon written motion of either party.”

. In 2009, before the child was of school age, the father’s weekend visitation time extended from Friday at 3:15 p.m. to Monday at 5:00 p.m. The evidence indicated that the father had failed to return the child in time for him to begin kindergarten on Monday, August 24, 2009, and for several Mondays after that. The mother filed an emergency motion to modify the visitation schedule, and the parties subsequently agreed that the father’s weekend visitation time would end on Sunday evenings rather than on Monday afternoons.