PITTMAN, Judge.
 

 Amber Dawn McElheny (“the mother”) appeals from a judgment of the Marshall Circuit Court modifying a 2001 judgment that had divorced her from Leonard John Peplinski (“the father”), had awarded the parties joint legal custody of the parties’ son (“the child”), and had awarded her primary physical custody of the child. The modification judgment under review awarded the parties joint legal and physical custody of the child. We affirm.
 

 In August 2007, the mother petitioned for a modification of child support, alleging that the father’s income and the child’s needs had increased. Additionally, the mother asked the court to reduce the father’s visitation rights to, essentially, those specified in a standard form order in customary use in the judicial circuit, instead of the Thursday-night-through-Monday-night visitation arrangement that had been ordered by the trial court in 2003. In September 2008, the father asserted a counterclaim seeking primary physical custody of the child or, in the alternative, an award of joint physical custody of the child. In support of his claim, the father alleged that “a material change in circumstances” had occurred and that it was “no longer in the best interest” of the child to live with the mother. Following an ore tenus proceeding, the trial court awarded joint legal and physical custody of the child to the parties. The mother then filed a postjudgment motion to alter, amend, or vacate the judgment, to which motion the father filed a response in opposition. Upon review, the trial court granted the mother’s motion in part and denied it in part, but it did not alter the custody determination. The mother thereafter appealed to this court.
 

 The mother raises two issues on appeal. First, the mother argues that the trial court erred to reversal by modifying custody. Second, the mother argues that the trial court erred in not awarding her child support based on the alleged difference in
 
 *276
 
 the parties’ earning capacities. We address each issue in turn.
 

 The mother asserts that she was initially awarded primary physical custody of the child in the parties’ divorce judgment and that she continued to have primary physical custody after the trial court modified the father’s visitation in 2003. The father contends that because the record on appeal does not contain the divorce judgment or the most recent custody-modification judgment, the fact that the mother had previously been awarded primary physical custody of the child was not established. The father argues that the mother testified only that she had “custody” of the child, which, he claims, is insufficient evidence that she had been awarded
 
 primary physical custody.
 
 Therefore, he claims, the record does not show that the judgment from which the mother has appealed was, in fact, a modification of a previous award of custody favoring the mother. Notwithstanding the father’s arguments, however, the record shows that the father, in his counterclaim seeking a modification of custody, expressly acknowledged that the mother had previously been awarded and, at that time, had primary physical custody of the child. Additionally, in that counterclaim, the father asked the trial court “to take judicial knowledge of all things had and done in [the] matter.” The father’s statements in his pleadings “constitute judicial admissions” that are conclusive of the issue.
 
 See Holway v. Wanschek,
 
 690 So.2d 429, 434 (Ala.Civ.App.1997). We conclude that the record, therefore, reveals that the mother had primary physical custody of the child at the outset of this proceeding.
 
 [1]
 

 The record shows that the parties and the child lived in Grant at the time the parties were divorced in 2001. After the divorce, the father continued to reside in the parties’ former home in Grant. The father testified that he had remarried in 2003 and lived with his wife (“the stepmother”) and their son (“the half brother”), who had been diagnosed with cerebral palsy. On the other hand, after the divorce, the mother and the child moved to Scant City, approximately 20 miles from Grant, where they had lived with the mother’s father (“the maternal grandfather”) for approximately one year. The mother and the child had thereafter moved to Arab for approximately 11 months before returning to the maternal grandfather’s home because the mother had experienced financial problems. In May 2008, the mother and the child had moved to Gadsden to live with the mother’s new husband and his mother.
 

 Although the record does not reveal the distance (in miles) between Gadsden and the maternal grandfather’s house, from which the mother and the child had moved, the mother avers that her current residence in Gadsden is 49 miles from
 
 Grant
 
 and the father avers that the mother’s current residence in Gadsden is between 54 and 67 miles away from
 
 his home.
 
 Nonetheless, the record shows that the child had spent a total of approximately three hours per day in an automobile when he had commuted back and forth from the mother and child’s new residence in Gadsden and the child’s school in Grant. Both parties testified that the child had been “tired” in the mornings; the mother claimed, however, that the child was always “tired” and “cranky” irrespective of whether he was at the mother’s or the father’s house. The mother testified that their routine, after they had moved to Gadsden, required the child to wake up around 5:45 a.m. and that he had usually gone to bed around 9 or 9:30 p.m.
 

 
 *277
 
 At trial, the father testified that he was seeking additional custody rights as to the child, either an award of primary physical custody or joint physical custody; he averred that, in his opinion, the child needed to be removed from the “hostile environment” of living with the mother, that “everything [the child] does is in Grant,” and that the child needed paternal guidance because he was maturing. The father explained that he had been prompted to seek additional custody rights after the child had allegedly told the father in August 2008 that he had not been getting along with the mother. He testified that, along with the child’s school, all the child’s friends were located in Grant. He further alleged that the child had asked him questions about male sexual physiology that, the father claimed, only he could fully answer.
 

 The father also testified that, because of the needs of the half brother, he and the stepmother have arranged their work schedules so that one of them is always at home with the half brother. The father stated that he had been an active participant in the child’s life; indeed, both parties testified that the child had been in the father’s care approximately 50 percent of the time since 2003.
 
 [2]
 
 He testified that he had led the child’s Cub Scout troop; that the stepmother had been the “den mother” of that troop; that he had coached some of the athletic teams on which the child had played; and that the child could no longer play basketball in Grant, as he had done in 2006, because the mother did not have time to accommodate the child’s extracurricular activities. He stated that they had registered the child for scouting activities in Guntersville, a location that was approximately halfway between the parties’ homes at the time. The father testified that they had chosen that location to register the child for scouting so that the father and the mother would equally be able to participate, but he claimed that the mother had accompanied the child to troop meetings only three or four times. The mother, on the other hand, explained that she had not attended the child’s troop meetings because her having not been involved in the way that the father and the stepmother were had made her uncomfortable. The record reveals that the child had also taken karate classes on Tuesday and Thursday nights in Albertville, to which the mother would drive him after school and from which the father would pick him up, on those nights that the father exercised visitation. When asked whether she had prevented the child from participating in other extracurricular activities, the mother stated that she had not. The mother explained that she had let the child choose whether he wanted to enroll in basketball or karate and that he had chosen karate. The father, on the other hand, averred that the mother’s schedule had prevented the child from getting involved in certain unspecified extracurricular activities; he testified that the child had missed parts of his childhood.
 

 The mother testified that she had worked as a dispatcher for a county sheriffs department after the parties’ divorce and had pursued a bachelor’s degree in elementary education at that time. After she had received that degree, the mother began teaching at a school in Grant in August 2006. The child, who had originally attended school in Scant City, had enrolled at the school where the mother was
 
 *278
 
 teaching in August 2006 upon the agreement of both parties. At trial, the parties expressed no current plans to enroll the child in another school. The mother testified that she had been granted tenure at that school and that she had no current plans to find work anywhere else. Both parents testified that the child had many friends in Grant and that he often attended spend-the-night parties with those friends on the weekends. The mother testified that she had always driven the child to Grant so that he could visit his friends on the weekends.
 

 The mother testified that she had petitioned to have the father’s visitation reduced because, she claimed, the father’s work schedule was such that the child would routinely spend his visitation time with the stepmother instead of the father. Specifically, the mother testified that the child had recently spent his birthday with his stepmother, rather than the father or the mother, and that it had hurt her feelings. The mother also stated that the child had become confused about the arrangement and, she averred, would often be unsure with whom he was supposed to commute on those days that the parties typically exchanged the child.
 

 Although the exact terms of the father’s preexisting visitation rights are not clear from the record, it appears that the father had originally been awarded visitation for every other Thursday evening at 6 p.m. until the following Monday evening at 6 p.m. Following the modification, in 2003, he had also exercised visitation with the child every Tuesday night. The record further reveals that the parties had shared custody of the child during the summer for rotating, two-week intervals.
 

 The record shows that the mother would drop the child off at the father’s house on those days that the child visited the father. Before 2006, when the child attended school in Scant City, he would ride the bus home on Mondays, even though the father had visitation until 6 p.m. The record shows that, once the child began attending school in Grant, the mother would drop the child off at the father’s house after school, despite the trial court’s order that had instructed the father to pick up the child. However, the record further shows that, at the beginning of the 2008 school year, the mother had driven the child back to Gadsden and had required the father to pick up the child at their home there, which had resulted in the child’s traveling in the car for an additional hour and a half on those nights that the child was scheduled to visit his father; the mother admitted that the additional travel time had likely not been a fair arrangement for the child, but she stated that it had not been her intent to harm the child. The record also shows that the child had consistently made grades of A or B in school; the mother, however, admitted that the child had the potential to do much better. The mother testified that she had tried to avoid communicating with the father about visitation because, she claimed, he had been “condescending” to her in the past. The record shows that the parties primarily communicate by sending text messages to one another and through e-mail.
 

 After the trial court ordered the parties to share joint physical custody of the child on an rotating week-to-week basis, the mother argued, in her postjudgment motion, that the trial court had had no basis on which to divest her of primary physical custody. Additionally, she contended that the trial court had erred in denying her claim for modification of child support; that it had acted outside its discretion in not setting forth custody arrangements for holidays and school vacations; that it had erred in not allocating responsibility for providing health-insurance coverage or for
 
 *279
 
 defraying other medical, dental, and pharmaceutical expenses not covered by insurance; and that the trial court had erred in not awarding the mother an attorney fee.
 

 In response to the mother’s motion, the father argued that the trial court’s award of joint physical custody was supported by the evidence. In further opposition to the mother’s motion, the father contended that the trial court’s award of joint physical custody rendered the matter of whether to award child support to either parent discretionary with the trial court and that the trial court had properly exercised that discretion. However, the father conceded that it might be “prudent” for the trial court to amend its order to address how the parties should exercise custody during certain times of the year and in making certain decisions for the child. Additionally, the father proposed a plan allocating decision-making authority regarding various aspects of the child’s life between the parties. Upon its review of the filings, the trial court denied the mother’s requests to vacate its ruling on the custody and child-support issues. However, the trial court provided, in its order, that the child was to continue attending the school he had been attending and that the father would be responsible for providing health-care insurance for the child.
 

 It is well settled that, to modify a previous custody award, “[t]he parent seeking the custody change must show not only that [he or] she is fit, but also that the change of custody ‘materially promotes’ the child’s best interest and welfare,” a standard most notably articulated and adopted in
 
 Ex parte McLendon,
 
 455 So.2d 863, 866 (Ala.1984). That case further states:
 

 “ ‘[The
 
 McLendon
 
 standard] is a rule of
 

 repose, allowing the child, whose welfare
 

 is paramount, the valuable benefit of
 

 stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court’s satisfaction that material changes affecting the child’s welfare since the most recent [judgment] demonstrate that custody should be disturbed to promote the child’s best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.’ ”
 

 McLendon,
 
 455 So.2d at 865-66 (quoting
 
 Wood v. Wood,
 
 333 So.2d 826, 828 (Ala.Civ.App.1976));
 
 see also Ex parte Cleghorn,
 
 993 So.2d 462, 469 (Ala.2008) (holding that a party seeking a modification of custody need not establish that a material change in circumstances has occurred such that it is overwhelmingly necessary to modify custody). Because the record, as we have discussed, reflects that the mother retained primary physical custody of the child at the commencement of the proceedings in the trial court, the father’s request for a change in custody was due to be considered by the trial court in light of
 
 McLendon. See Ex parte Johnson,
 
 673 So.2d 410, 413 (Ala.1994) (“If one parent has previously been granted primary physical custody or if one parent has ‘given up’ legal custody, then an existing custody arrangement will be modified only if the modification materially promotes the best interests and welfare of the child.”);
 
 Berrey v. Berrey,
 
 622 So.2d 1316, 1318 (Ala.Civ.App.1993) (holding that
 
 McLendon
 
 governed when the parties shared joint legal custody but the mother had primary physical custody subject to the father’s visitation).
 

 The mother contends that the trial court’s modification judgment should be
 
 *280
 
 reversed because, she claims, the father failed to meet the
 
 McLendon
 
 standard, as a matter of law. The mother alternatively contends that the cause should be remanded because, she avers, the trial court did not expressly state the custody-modification standard that it had applied in its judgment. In asserting that second argument, the mother relies on
 
 C.A.M. v. B.G.H.,
 
 869 So.2d 507 (Ala.Civ.App.2003), in which a trial court had modified its previous award of primary physical custody to the mother to award primary physical custody to the father in response to the father’s claim that the mother was sexually abusing the child in that case. In its modification judgment, however, the trial court did not identify the custody-modification standard that it had applied, nor did it set forth the factors that it had considered in reaching its determination. As a result of this court’s “inability to determine the standard” that the trial court had applied in that case, combined with “the particularly close facts” of that case, we remanded the case “to allow the trial court to evaluate the evidence in accordance with the standard set forth in
 
 Ex parte McLendon." C.A.M.,
 
 869 So.2d at 508.
 

 It is well settled, however, that we “will not presume error on the part of the trial court,”
 
 Pickett v. Pickett,
 
 792 So.2d 1124, 1128 (Ala.Civ.App.2001), nor do we require a trial court to set forth “conclusions of law in its final order unless a statute specifically requires it to do so,”
 
 Taylor v. Taylor,
 
 387 So.2d 849, 852 (Ala.Civ.App.1980);
 
 see also
 
 Rule 52(a), Ala. R. Civ. P. Moreover, the facts in
 
 C.A.M.
 
 are distinguishable from the facts in this case because they were “particularly close.” Likewise distinguishable from this case is
 
 Wood v. Wood,
 
 29 So.3d 908, 911 (Ala.Civ.App.2009), another case cited by the mother in support of her position. In
 
 Wood,
 
 we reversed the judgment and remanded the case to the trial court after concluding that the trial court had erred in treating the mother’s agreement to allow the father to exercise visitation in accordance with his work schedule as being a voluntary relinquishment of the mother’s primary physical custody so as to lessen the burden that the father was required to meet. 29 So.3d at 911. Although the trial court’s judgment in
 
 Wood
 
 was indeed silent as to the modification standard that that court had applied, the findings of fact made by the trial court in that case indicated that the trial court had applied an improper modification standard, and, thus, we had no basis on which to
 
 not
 
 presume error.
 

 In this case, however, the trial court’s judgment stated that “[hjenceforth, the parties shall share joint physical custody,” which language indicates to us that the trial court undoubtedly treated its decision as a modification of a previous custody arrangement under which a party was entitled to primary physical custody. Accordingly, we must presume that the court applied the
 
 McLendon
 
 standard. Even if the trial court had applied the wrong standard, “when the standard applied by the trial court in reaching its custody determination is improper, that judgment is due to be reversed and the cause remanded
 
 unless
 
 the error is harmless.”
 
 McCain v. McCain,
 
 895 So.2d 362, 363 (Ala.Civ.App.2004) (citing
 
 Rehfeld v. Roth,
 
 885 So.2d 791 (Ala.Civ.App.2004)) (emphasis added);
 
 see also West v. Rambo,
 
 786 So.2d 1138, 1141 (Ala.Civ.App.2000) (indicating that, if evidence supports a change of custody under the
 
 McLendon
 
 standard, a trial court’s application of the standard set out in
 
 Ex parte Couch,
 
 521 So.2d 987 (Ala.1988), is harmless). Thus, our next step in analyzing the propriety of the trial court’s judgment is to determine whether the facts of this case satisfy the
 
 McLendon
 
 standard.
 

 
 *281
 
 When we review a trial court’s judgment with regard to child custody that is based on ore tenus evidence, we afford a presumption of correctness to that judgment and we will reverse only if “ ‘the evidence ... fails to support the determination [so] that [that judgment] is plainly and palpably
 
 wrong....'"'" Gilliam v. Gilliam,
 
 876 So.2d 1135, 1140 (Ala.Civ.App.200S). “ ‘This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility[, which] opportunity ... is especially important in child-custody cases.’ ”
 
 Id.
 

 The record reveals undisputed evidence indicating that the mother’s move to Gadsden requires the child to be in the car for approximately three hours everyday, but the record is unclear as to the distance between the mother and the child’s new home in Gadsden and the paternal grandfather’s house in Scant City, where the mother and the child had resided before moving to Gadsden. The record does, however, show that their home in Gadsden is 49 miles from Grant, where the child’s school was located, and between 54 and 67 miles from the father’s house, also in Grant. In
 
 Marsh v. Smith,
 
 37 So.3d 174, 178 (Ala.Civ.App.2009), we recognized that a change in the principal residence of the child is “presumed not to be in the best interest of [the] child [and] is necessarily a material change” when that relocation is to a location that is more than 60 miles away or across state lines. 37 So.3d at 178 (citing
 
 Toler v. Toler,
 
 947 So.2d 416 (Ala.Civ.App.2006));
 
 cf.
 
 Ala.Code 1975, § 30-3-169.4 (addressing relocations of greater distance than 60 miles or across state lines). In this case, the mother and the child’s relocation to Gadsden does not give rise to a presumption that that relocation is a material change and not in the child’s best interest, under
 
 Marsh,
 
 because the record does not establish that the relocation is more than 60 miles away from the maternal grandfather’s house, though it is likely close. However, the trial court may consider a change in principal residence as a factor in determining whether to modify custody,
 
 Marsh, supra,
 
 and, especially in light of the increased amount of time that the child is required to travel to school and to his activities, the trial court had ample bases to do so here. The evidence presented also supports the conclusion that the time that the child has had to do his homework is necessarily compromised by the commuting time to and from school everyday from the mother’s Gadsden home and that the long drive is the reason why, as both parents testified, the child is “tired.” Although the record shows that the child had performed well in school, the mother testified that the child actually had the potential to perform better. Because the evidence supported the propositions that a change in the principal residence of the child had occurred following the most recent custody judgment and also that that change had detrimentally affected the child, the trial court’s modification of custody did not amount to error.
 

 The record further shows that the trial court could have properly considered the desirability of fostering the child’s relationship with the father, as evidenced by the undisputed testimony that the child had been maturing and had asked sensitive biological questions that would ideally be most comfortably addressed to, and answered by, the father, to be an additional factor favoring modification of custody.
 
 See Gilliam,
 
 876 So.2d at 1141 (quoting
 
 Ex parte Devine,
 
 398 So.2d 686, 696-97 (Ala.1981)). Moreover, the rotating, week-to-week custody arrangement ordered by the trial court is not
 
 ipso facto
 
 inconsistent with the emphasis on stability expressed in the
 
 McLendon
 
 standard. Indeed, the week-to-week arrangement could have
 
 *282
 
 been viewed by the trial court as a
 
 more
 
 stable routine for the child, as compared to the previously ordered arrangement (which had awarded the father visitation for every other Thursday night through Monday night and every Tuesday night), especially in light of the mother’s testimony that the child had been confused by that previous arrangement.
 

 Finally, we acknowledge that “ ‘[t]he joy of companionship and of daily service for one’s children are among the sacred rights of parenthood’ ” and that such “ ‘relations hold the best there is in life.’ ”
 
 Statham v. Statham,
 
 282 Ala. 322, 326, 211 So.2d 456, 459-60 (1968) (quoting
 
 Sparkman v. Sparkman,
 
 217 Ala. 41, 43, 114 So. 580, 582 (1927)). We agree with the father’s argument that, in this case, the trial court found a way to award
 
 both
 
 parents that “ ‘joy of companionship’ ” and enabled the child to better adjust to those changes that resulted from the move to Gadsden.
 

 Because we have determined that the record exhibits adequate grounds on which the trial court could have modified custody and properly awarded joint physical custody to the parties, the trial court had no legal obligation to require the father to pay any child support to the mother.
 
 Allen v. Allen,
 
 966 So.2d 929, 932-33 (Ala.Civ.App.2007) (quoting
 
 Boatfield v. Clough,
 
 895 So.2d 354, 357 (Ala.Civ.App.2004)) (holding that a trial court is not required to provide for a child-support obligation when it orders parents to share joint physical custody of the child). Therefore,- the mother’s second issue concerning the trial court’s decision not to award child support to either party, notwithstanding claimed differences in the parties’ earnings, is without merit.
 

 For the reasons stated above, the trial court’s judgment is due to be affirmed.
 

 AFFIRMED.
 

 BRYAN and MOORE, JJ., concur.
 

 THOMPSON, P.J., and THOMAS, J., concur in the result, without writings.
 

 [1]
 

 . The mother's motion to supplement the record is thus denied as moot.
 

 [2]
 

 . The father presented evidence in the form of a calendar indicating those days of the week that the child had routinely been in his care, which showed that the child had been in his care approximately 50 percent of the time. The mother testified that the calendar was accurate.