PER CURIAM.
Regina Moates Rigby ("the mother") appeals from a judgment of the Elmore Circuit Court ("the trial court") that, among other things, divorced her from Christopher Lee Rigby ("the father") and awarded them joint custody of the parties' four children. We affirm.
Background
The parties were married in 1998. Four children were born of their marriage: Tyler, who was born in December 2002; Brianne, who was born in July 2006; and Wyatt and Bailey, twins who were born in October 2009. In February 2016, the mother filed a complaint seeking, in relevant part, a divorce from the father, an award of "primary" physical custody of the children, and an award of child support. The father answered the mother's complaint and counterclaimed seeking, in relevant part, a divorce from the mother, an award of "primary" physical custody of the children, and an award of child support. The parties continued to live in the marital residence during the pendency of the divorce action but had separate bedrooms. The trial court conducted a trial on March 6, 2017. The relevant evidence presented revealed the following.
The mother testified that the father was a registered nurse when they met. She was a respiratory therapist. The mother said that the father later returned to school on two occasions to become a nurse practitioner and a nurse anesthetist, respectively. During cross-examination, the mother stated that she had also obtained a bachelor's degree and a master's degree in business during the marriage. She also testified, however, that she had not been employed in a position requiring those degrees.
The mother said that, during the approximately 30 months it took him to obtain his nurse-anesthetist certification, the father had not worked or provided support for the family. The mother said that the parties had used the proceeds from the sale of a house that she had owned before the parties were married to help meet living expenses during that time. The mother, who had stopped working for a period, started working as a respiratory therapist again after Brianne was born.
After the father obtained his nurse-anesthetist certification in January 2008, he began working in a group practice in Montgomery, where he was still working at the time of the trial. The mother said that she had worked only two days per *78 month from approximately 2008 until early 2016 because Wyatt and Bailey were born prematurely and because "MRSA," which, she said, was "a resistant form of staph," was discovered in her breast. The mother testified that, despite suffering various illnesses and complications with her health, she had continued to provide for the children's care during the marriage. She answered in the affirmative when asked during direct examination whether the parties' marriage had, by agreement, been "sort of ... traditional where the wife is working less, taking more responsibility with the children, [and] the husband [is] working more, paying more expenses ...." She said that the father had preferred that arrangement and had even, at times, expressed his desire for her to stop working altogether. The mother described the father's work schedule before the divorce action was commenced, which involved being on call for substantial periods of time, working long hours, and getting off work at odd hours.
The mother testified that she was planning to return to work after the parties' divorce and expected to earn a gross monthly income of $2,429. She also offered as evidence a list of what she anticipated her monthly expenses would be after the parties were divorced. The monthly expenses totaled $9,645 and included costs for the children and health insurance to cover them.
The mother also testified that the father had earned more than $200,000 in 2016. She said that she was requesting $3,637 per month in child support. If awarded that amount, she said, she wanted $1,000 per month as alimony for a period of five years; she said that she wanted alimony for a longer period of time if she was awarded less child support.
The mother testified regarding the parties' lack of physical intimacy and the self-esteem issues that she had suffered as a result of feeling that the father was not attracted to her. She said that the father had expressed his desire to get divorced in 2014, and she offered documentary evidence demonstrating his communications with other women. She denied that she had had an affair, although she did admit to kissing a man at a restaurant during the pendency of the divorce action.
Extensive evidence was offered regarding the father's viewing of pornography on the Internet in the bedroom that the parties had shared before the divorce action was commenced -- where the children had also sometimes watched television and played. It is undisputed that the father viewed pornography; however, the mother clarified that she was not accusing the father of abusing the children, forcing them to view pornography, or doing anything inappropriate with them. She stated that she was "[a]bsolutely not" accusing him of any sexual activity involving the children. She said that the foregoing evidence simply demonstrated his lack of sound judgment.
The mother testified regarding contact she had made with the Family Sunshine Center in June 2016 to, she said, get "help" with the way that the father treated her because, in her opinion, it "was not right." Specifically, she stated: "I went because my husband had not touched me in 12 years."[1] She said that, although she had protested, the counselor at the Family Sunshine Center had contacted the Department of Human Resources after hearing the mother's complaints regarding, *79 among other things, the father's viewing of pornography. She denied that she had accused the father of anything. She said that nothing had come of the investigation conducted by the Department of Human Resources, which, she said, had involved interviewing the children.
The mother also testified regarding the various medical conditions that affected Wyatt and Bailey. Wyatt, she said, weighed two pounds when he was born and suffered from "a lot of [gastrointestinal] problems, some lung problems from prematurity, [and] some feeding issues." She said that Wyatt had undergone four surgeries but that he was doing well at the time of the trial. The mother testified that Bailey had weighed one pound, seven ounces when she was born. She said that Bailey was cognitively delayed and suffered from vision problems and "sensory issues"; for instance, on one occasion, she said, they discovered that Bailey had apparently removed her own toenails and had given no indication that she was in pain or discomfort. The mother said that Bailey did not begin chewing food until she was more than three years old because she had been fed through a tube as an infant and had therefore not developed the necessary reflexes to eat properly.
At the time of the trial, the mother said, Bailey was doing better but was "by far not to her peers." She said that Bailey was undergoing speech, occupational, and equestrian therapy at the time of the trial and that she was enrolled in a soccer program. She said that Bailey had also participated in gymnastics and swimming, but she said that, around the time that he said he wanted a divorce in August 2014, the father had not agreed to let Bailey continue participating in those activities. The mother said that she did not doubt that the father loved the children, but, she said, he had not participated "at all" in obtaining services for Wyatt's and Bailey's special needs.
The mother testified that she would like the parties to be awarded joint legal custody of the children and that she wanted physical custody of the children. She said that she still wanted the father to be involved in the children's lives and that she believed that maintaining a relationship with him was "[a]bsolutely" critical. The mother testified that she takes care of the children during the week. She said that, during the pendency of the divorce action, she had unsuccessfully attempted to communicate with the father regarding the children. The mother opined that she could provide better stability for the children and that they were her priority.
The mother testified that the father had attempted to care for the children alone for one whole week during the pendency of the divorce action and that Wyatt and Bailey had struggled during that time. Specifically, she said that Wyatt had urinated on himself and Bailey "had had a meltdown in therapy." In addition to the care that she provided the children, the mother said that they came to her if they had an issue with something. The mother said that the father was not patient with Bailey and that he had screamed at her on one occasion during the year before the trial. The mother stated that she participated in the children's field trips and activities and that the father was not involved in those activities. During cross-examination, the mother admitted that the father had provided care for the children occasionally and also stated: "We did a lot of joint decision making"; she disagreed that she "wore the pants in the family."
The mother called the father to testify as an adverse witness. The mother's attorney questioned the father about his work schedule, specifically about the week before the trial as an example. The father *80 testified that he had not seen the children a great deal during that week. He said that he worked an average of 55 hours per week. Regarding his anticipated work schedule following the parties' divorce, however, the father said:
"I make the schedule at our work[,] and I've talked with my bosses ... and I've been given the ability to make whatever type I need that works out for me. So[,] for shared custody, if that were to be the case, I can work out an 8:00 to 4:00 schedule or a 9:00 to 5:00 schedule, whatever I need in order to be able to help take care of the kids."
The father admitted that, when at the marital residence during the pendency of the divorce action, he had spent substantial periods of time in his room and away from the mother and the children. He said that he had done so because he felt "uncomfortable" around the mother and wanted to "keep the peace." When pressed further by the mother's attorney, the father admitted that he had not spent as much time with the children as he "should have." The father also admitted that, at the time of his deposition, he had been unaware that Bailey was continuing to receive speech therapy. Regarding transporting the children to their various appointments, the father said that "[b]y far the majority of" that responsibility had fallen on the mother.
The father testified that, before Wyatt and Bailey were born, he "did everything [the mother] did" regarding the children's care. He said that the mother had become more involved in the children's care after Wyatt and Bailey were born due to the nature of their medical conditions. The father testified that he could adequately care for the children, as he had done in the past. He said that he had provided adequate care for the children during the week they had spent alone with him during the pendency of the divorce action, although he recalled Wyatt wetting the bed and Bailey becoming upset during a therapy session.
Regarding the parties' ability to co-parent, the father said that they had not been successful during the year preceding the trial. He admitted that he had not communicated with the mother regarding the children's teachers or therapists. He agreed that the children had become accustomed to having the mother around most of the time. The father also testified that the mother had not tried to communicate with him regarding the children.
The father admitted that he had visited pornography Web sites "[p]ossibly" every other day. He opined that he did not view pornography excessively, and he testified that the children were not in the parties' bedroom while he viewed pornography. The father also admitted to having communicated with other women during the marriage, and he said that he had told the mother he thought they should get divorced in 2014. He denied having an affair or committing adultery. The parties' attorneys orally stipulated during examination of the father that the Department of Human Resources had conducted an investigation but had found no abuse indicated.
The father testified that the mother had downloaded sexually explicit stories from the Internet. He said that he had seen material printed from a Web site and sex toys in the mother's nightstand drawer and that the stories included explicit descriptions of specific sex acts involving, among other things, multiple people. The father testified that the mother had, within the five years preceding the trial, hosted what the father's attorney described as a "sex toy party" in the marital residence. The father said that he did not believe any of the foregoing made the mother a bad person or a bad mother. He said that, on *81 at least one occasion, he had discovered condoms in the mother's gym bag. He agreed that the parties had not been physically intimate in many years.
The father testified that he earned base pay of $150,000 annually and that, in 2016, he earned roughly $50,000 in additional income as a result of "call pay" and "overtime pay." He said that he could change his schedule after the parties were divorced, choosing to forgo the latter forms of compensation and elect to earn only his $150,000 base pay. The father stated that he expected to earn $12,500 per month following the parties' divorce. If ordered to pay monthly child support of $3,326, the father said, his total monthly expenses would be $12,385. However, the father asked the trial court to deviate from the "standard child support obligation" if he was awarded custody of the children during alternating weeks. He said that he would have to provide for the children as much as the mother would. When questioned by the mother's attorney regarding the disparity between the parties' anticipated incomes, the father said of the mother: "I think she's a well educated woman and capable of making much more than $29,000 a year."
The mother called several other witnesses to testify, including two school teachers, a speech therapist, and a teacher for the visually impaired. The overall takeaway from much of the testimony elicited by the mother from those witnesses was that she was involved in the children's school activities and therapies and that the father was not. During questioning by the father's attorney, the witnesses who said they were "mandatory reporters" noted that they had never made a report regarding suspected abuse of the children.
During his case-in-chief, the father called three witnesses to corroborate his testimony that he was a good father and was capable of caring for the children. One of the witnesses testified that the mother had approached her in a department store to discuss the parties' divorce and the father's sexual orientation; she said that one of the children had been standing next to the mother during the encounter. Testimony elicited from one of the other witnesses implied that the mother had engaged in extramarital affairs. The mother disputed much of that testimony in rebuttal.
Tyler testified extensively in camera. Tyler said that he loved both of his parents but preferred to live with the mother, and he opined that staying with the father every other weekend would be best. Tyler's testimony also indicated that, among other things, he believed the mother could better care for the children. Tyler's testimony also indicated that a nanny or a babysitter had provided for some of the children's care and transportation. At the close of all the evidence, the trial-court judge stated, among other things: "I will say the one good thing that I've heard today was through [Tyler] who sat there and said both of my parents encourage me and my siblings to interact with the other parent."
On August 17, 2017, the trial court entered a judgment that provided, in relevant part:
"The [father] has a bachelor's of science [degree] in nursing, which he obtained prior to the parties' marriage, as well as a master's of science [degree] in nursing and a master's of science [degree] as a nurse anesthetist, both of which he obtained during the marriage; the [mother] has a bachelor's of business [degree] and a master's of business [degree,] which she obtained during the marriage, as well as an associate's degree in respiratory therapy, which she obtained prior to the marriage.
*82 "Both parties have worked during the marriage ... though the father has been the primary income earner of the family. The children require a great deal of time allocated to their care. Neither party will individually have enough time to care for the children, as they required a nanny/babysitter while married due to their time issues even when the [mother] was not employed, and the [mother] has had to obtain employment due to this divorce; neither party has shown that the other is unfit to care for the children ....
"....
"10. Alimony:
"1. The [father] shall pay $1,000 per month in alimony for a period of 24 months commencing September 1, 2017.
"11. Custody of Children:
"Pursuant to Code of Alabama, § 30-3-150 et seq., commonly known as the Joint Custody Statute, the parties shall have joint legal and physical custody of the minor children, and it is the intent of the Court, consistent with the statute, that the children have frequent and substantial contact with both parents. Our appellate court has repeatedly explained that custody determinations must be grounded in what is truly best for the minor children and such cases do not turn on what either party merely wants. The Court's highest duty is to the children, 'all other rights [including those of the parents] are secondary.' Ex parte D.W.W., 717 So.2d 793 [, 796] ( Ala. 1998). The Court finds it is in the best interests of the children to have equal time with each parent. Parenting time provided for herein shall not preclude other and further parenting time as the parties may from time to time agree.
"....
"E. Decision Making Authority -- Should the parties be unable to agree after discussion, consultation, and deliberation, the [mother] shall have final decision-making authority regarding issues concerning the children's health, and religious needs, and education in odd years, the [father] in even years and the [father] shall have final decision-making authority regarding issues concerning extracurricular activities in odd years, the [mother] in even years.
"....
"2. Each party shall pay all day-to-day expenses of the children while they are in that party's care. Each will have clothing and uniforms at their respective homes. The parties will share all major expenses of the children equally, including extracurricular expenses*[2 ] such as sports, band, dance or school registration fees and supplies.
"The Court will take a very conservative stance on extra-curricular activities and the reimbursement of the same. While these activities are beneficial to the child in most cases, these decisions must be based on the reasonableness of the cost and each party's ability to afford the same.
"3. The parties will maintain health insurance on the minor children in the same manner in which it currently exists, with [the father] being responsible for ensuring the children are insured. Each party shall pay one-half of all uninsured and/or unreimbursed medical, dental, pharmaceutical, psychological, psychiatric, optical and orthodontic expenses of the minor children, including co-payments.
"....
"4. The payment of child support shall not be owed by either party, based *83 on the parties having equal access to the children. The parenting plan issued by this Court is the purpose f[or] the deviation from Rule 32, [Ala. R. Jud. Admin.]."
On September 13, 2017, the mother filed a postjudgment motion challenging the portions of the trial court's judgment regarding custody, the allocation of final decision-making authority, and the failure to award child support. On September 28, 2017, the father filed a response to the mother's postjudgment motion, in which he included a "counterclaim to alter, amend, or vacate," asserting that, since entry of the trial court's judgment, Tyler had begun to refuse to spend time with him. On November 29, 2017, the father filed what he called a "motion to require attendance of minor children" at the postjudgment hearing, in which he asserted that Brianne had also begun refusing to spend time with him.
The mother filed a response to the father's motion, arguing, in relevant part, that, because the underlying facts had occurred since entry of the trial court's judgment, the trial court could not consider the father's allegations at the postjudgment hearing and that the father should have instead asserted them in a new, separate action. On December 1, 2017, the trial court entered an order granting the father's "motion to require attendance of minor children." The mother filed an "objection" to the trial court's ruling.
On December 4, 2017, the trial court conducted a postjudgment hearing. That same day, the trial court entered an order denying the mother's postjudgment motion. The trial court did not enter an order addressing the father's postjudgment motion, and it was therefore denied by operation of law. See Rule 59.1, Ala. R. Civ. P. The mother filed a timely notice of appeal on January 10, 2018.
Analysis
The mother first argues that the trial court's award of joint physical custody was not supported by sufficient evidence. One of the cases that the mother cites in support of her argument is Hyche v. Hyche, 226 So.3d 673 (Ala. Civ. App. 2016). The father asserts that the mother's reliance on Hyche is misplaced because, he says, that case is "strikingly similar in several ways to the present case."[3]
The mother in Hyche also argued that a trial court's award of joint physical custody was not supported by sufficient evidence. Id. at 674. In affirming the trial court's resolution of that issue, we recited the following relevant general legal principles:
" 'It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best *84 interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage. Joint custody does not necessarily mean equal physical custody.'
"§ 30-3-150, Ala. Code 1975.
" ' "[O]ur review of custody determinations based on ore tenus evidence is quite limited; the trial court's custody judgment is presumed correct and should be reversed only if the judgment is plainly and palpably wrong." Smith v. Smith, 887 So.2d 257, 262 (Ala. Civ. App. 2003).
" '....
" 'In Graham v. Graham, 640 So.2d 963, 964 (Ala. Civ. App. 1994), this court wrote:
" ' "In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. Hall v. Hall, 571 So.2d 1176 (Ala. Civ. App. 1990). The trial court's overriding consideration is the children's best interests and welfare. Santmier v. Santmier, 494 So.2d 95 (Ala. Civ. App. 1986). The factors that enter into the court's custody determination include the child's age and sex and each parent's ability to provide for the child's educational, material, moral, and social needs. Tims v. Tims, 519 So.2d 558 (Ala. Civ. App. 1987). Likewise, it is proper for the court to consider the 'characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and each parent.' Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981)." '
" Harris v. Harris, 59 So.3d 731, 734-35 (Ala. Civ. App. 2010).
"In addition, § 30-3-152, Ala. Code 1975, provides, in pertinent part:
" '(a) The court shall in every case consider joint custody but may award any form of custody which is determined to be in the best interest of the child. In determining whether joint custody is in the best interest of the child, the court shall consider the same factors considered in awarding sole legal and physical custody and all of the following factors:
" '(1) The agreement or lack of agreement of the parents on joint custody.
" '(2) The past and present ability of the parents to cooperate with each other and make decisions jointly.
" '(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent.
" '(4) Any history of or potential for child abuse, spouse abuse, or kidnapping.
" '(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody.
" '(b) The court may order a form of joint custody without the consent of both parents, when it is in the best interest of the child.' "
226 So.3d at 674-75.
The mother also points to § 30-3-152(c), Ala. Code 1975, which provides, in its entirety:
"If both parents request joint custody, the presumption is that joint custody is in the best interest of the child. Joint custody shall be granted in the final order of the court unless the court makes specific findings as to why joint custody is not granted."
*85 The mother cites Vest v. Vest, 215 So.3d 552, 559 (Ala. Civ. App. 2016), for the proposition that, because she did not request an award of joint custody, § 30-3-152(c) should not operate to create a presumption that an award of joint custody was in the children's best interest. We agree. As noted in the quotation from Hyche, however, § 30-3-152(b) allows trial courts to order joint custody without the parents' consent when doing so is in the best interest of the children.
Regarding that question, the mother, like the mother in Hyche, "essentially argues that the trial court should have interpreted the evidence presented in particular ways or placed more emphasis on certain portions of the evidence." Hyche, 226 So.3d at 678. Specifically, the mother points to the evidence presented demonstrating Tyler's preferred custodial arrangement and to the evidence presented regarding the disparity between her level of involvement in the children's lives and that of the father. She also cites the evidence presented indicating that she was better suited to provide stability for the children and to address their special needs and to the evidence presented regarding the father's viewing of pornography. In other words, she contends that application of the factors listed in Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981), should have foreclosed an award of joint physical custody.
The father, however, presented evidence indicating that he was, in fact, capable of providing adequate care for the children. Although he admitted that he had not been as involved in the children's lives as the mother, he also opined that he had the ability to meet their needs, and he elicited testimony from other witnesses to corroborate his testimony. Regarding the father's viewing of pornography, the mother testified that she was not accusing the father of exposing the children to that material, and the father presented evidence indicating that the mother had also possessed sexually explicit materials.
" '[W]e are "charged only with determining whether the evidence was sufficient to support the trial court's judgment" and not with determining whether there was a sufficient basis for a different judgment than that entered by the trial court,' .... Henning v. Henning, 26 So.3d 450, 455 (Ala. Civ. App. 2009) (quoting Ex parte Ederer, 900 So.2d 424, 426 (Ala. 2004) )."
Hyche, 226 So.3d at 678-79. In its judgment, the trial court specifically determined that "it is in the best interests of the children to have equal time with each parent." Although the evidence presented regarding the factors set out in Ex parte Devine, 398 So.2d at 696-97, might also have supported an alternative custody arrangement, we are not convinced that an award of joint physical custody was foreclosed as a matter of law.
"We next consider ... the factors enumerated in § 30-3-152(a), Ala. Code 1975." Hyche, 226 So.3d at 679. Of those factors, the mother specifically relies on the evidence presented demonstrating the parties' failure to communicate and cooperate regarding issues related to the children. It was undisputed that the parties had not communicated well during the pendency of the divorce action and had therefore not cooperated regarding the children or made decisions jointly during that time. That evidence, however, did not compel a determination that they were unable to do so. The mother specifically testified that the parties "did a lot of joint decision making" in the past. Moreover, the father's testimony indicates that his failure to communicate with the mother stemmed, at least in part, from his unwillingness to physically confront her in the marital residence, *86 where both parties lived during the pendency of the divorce action. In light of the evidence presented regarding his ability to provide adequate care for the children and his willingness to alter his work schedule following the parties' divorce, the trial court could have determined that the father would be more flexible and willing to communicate and coordinate with the mother after the parties were divorced and no longer cohabiting.
The mother next argues that the trial court erred to reversal by awarding the parties annually alternating final decision-making authority because such an arrangement, she says, does not promote stability for the children. In response, the father asserts:
"Any argument by the [mother] that the award of alternating decision making authority will be disruptive is purely speculative. In fact, such an arrangement may cause the parties to work together more effectively. Each party knowing that a draconian decision made against the interests of the other parent could be revisited in a reciprocal manner upon themselves, may very well foster collaboration."
The mother bases her argument on an assertion that the arrangement set out in the trial court's judgment is derived from proposed legislation that failed to pass, but she does not direct us to that bill. As the father points out, the only authority the mother cites in support of her argument is Hovater v. Hovater, 577 So.2d 461 (Ala. Civ. App. 1990). In that case, which predates enactment of the joint-custody statutory framework, see § 30-3-150 et seq., Ala. Code 1975, this court discussed the legal concept of joint custody and noted the difficulties that may accompany such awards. Hovater, 577 So. 2d at 466. Of course, we did not address the issue raised here.
We question whether the decision-making arrangement in this case will effectively promote stability for the children, and we note the astute concerns raised by Presiding Judge Thompson in his special writing regarding the parties' historic relationships with each other and the children. Complications are easy to foresee under these circumstances. However, § 30-3-152(a) specifically provides: "The court ... may award any form of custody which is determined to be in the best interest of the child." (Emphasis added.)
At this stage, no evidence has been presented demonstrating that the arrangement set out in the trial court's judgment will not serve the children's best interests or adequately suit the needs of the family following the parties' divorce. It may indeed do so under certain circumstances, and it was the function of the trial court to decide in the first instance whether the parties possess the capacity to make joint decisions for the children's benefit. Its chosen arrangement may be an attempt to create a "starting point" for the parties that provides relatively equivalent prospective footing, which could, it may have reasoned, serve the children's best interests by equalizing the authority delegated to each parent. Moreover, should the arrangement prove to be unstable at any time, evidence regarding that issue may be presented in a subsequent modification action.
We have been directed to no authority that prohibits imposition of the admittedly unorthodox arrangement set out in the trial court's judgment. Section 30-3-152(a) expressly grants a great deal of discretion to trial courts when making custody determinations. In light of the absence of contrary legislative direction and the relatively limited arguments presented by the parties in this case, we decline to, as a matter of law, diminish trial courts' discretion *87 under these circumstances. Whether the courts of this state should be precluded from creating the types of custodial arrangements presented here is a question best addressed by the legislature, which conferred upon the trial courts the broad powers set out in § 30-3-152(a). See Springhill Hosps., Inc. v. State Health Planning & Dev. Agency, 224 So.3d 670, 676 (Ala. Civ. App. 2016) ("Consideration of the wisdom of such a scheme is not within the province of this court ...."). We will therefore not reverse the trial court's judgment based on the mother's second argument.
The mother next argues that the trial court erred by failing to award her child support. Specifically, she asserts:
"The [mother] does not argue that the trial court was without jurisdiction to decline an award of child support, nor does [she] argue that an equal sharing of parenting time can be justification for declining to award child support. It is, however, the [mother]'s contention that[,] given that the children should not suffer financially from the breakup of their family, that child support is for the sole benefit of the child, and that children should be allowed to maintain the same financial condition as they would have had if their parents had not divorced, when the discrepancy in the parties' incomes is so significant and the expenses for the children are extraordinary as with the special needs of the children in this case, it is an abuse of discretion and a failure to protect the welfare and best interests of the ... children by not awarding child support. In this case[,] the [father] conceded that his child support obligation would be $3,637.00.[4 ]... Notably[,] while the [father] asked the trial court to award a week on/week off custody arrangement, the [father] did not ask the trial court to relieve him of an obligation to pay child support. To the contrary, the [father] testified as to what his child support obligation would be as if he expected to pay child support even with a week on/week off custody award, and he included a child support obligation as part of his post divorce expenses."
In response, the father argues that "[t]his Court has specifically addressed a disparity in income between parents awarded joint custody" and cites Bonner v. Bonner, 170 So.3d 697 (Ala. Civ. App. 2015). In Bonner, the evidence presented indicated that the husband earned income of $18,065 per month and that the wife earned income of $1,300 per month. Id. at 700. In relevant part, we noted the following regarding the issues raised on appeal:
"The wife contends that the trial court erred in not ordering the husband to pay child support.
" 'Actions concerning child support, although guided by the mandatory application of Rule 32, Ala. R. Jud. Admin., are still committed to the sound discretion of the trial court, and its decision on such matters will not be disturbed on appeal absent a finding that the trial court's award is a palpable abuse of its discretion. Peck v. Peck, 581 So.2d 1119 (Ala. Civ. App. 1991) ; Belser v. Belser, 558 So.2d 960 (Ala. Civ. App. 1990). The amount of support which would result from the application of the guidelines is presumed to be the correct amount of child support. Rule 32(A), Ala. R. Jud. Admin. This presumption may be rebutted *88 if the trial court makes a finding of fact that, based upon the evidence presented, the application of the guidelines would be manifestly unjust or inequitable. Rule 32(A)(ii), Ala. R. Jud. Admin.; Peck, supra. '
" Hutchins v. Hutchins, 637 So.2d 1371, 1373-74 (Ala. Civ. App. 1994). The trial court found that 'application of the Child Support Guidelines of Rule 32 of the Alabama Rules of Judicial Administration in this matter would be manifestly unfair or inequitable because of the joint physical custody arrangement of the order.' The wife argues that the divorce judgment lacks sufficient factual findings to justify the deviation from the child-support guidelines. However, '[s]hared physical custody is a recognized basis for such a deviation.' Shewbart v. Shewbart, 19 So.3d 223, 231 (Ala. Civ. App. 2009). The trial court stated in the divorce judgment that the joint-physical custody order was the reason for not ordering child support. The divorce judgment, therefore, contains proper justification for deviating from the child-support guidelines. See id.
"The wife further argues that the trial court failed to consider the disparity in income between her and the husband in declining to order child support to be paid. She asserts that her health issues impact her ability to work and that, pursuant to the divorce judgment, her mortgage and car-loan obligations totaling $2,267 a month exceed her monthly income. We note that, although the wife reported a monthly income of only $1,300 in her CS-41 form, the divorce judgment ordered that the wife was to receive $880 from the husband's military-retirement benefits each month (15.46% of $5,698) and $2,000 a month in alimony for 12 months. Additionally, the trial court received evidence regarding the wife's legal education and experience as an attorney. Although the wife testified that she had been diagnosed with [common variable immune deficiency] and that that condition impacted her ability to work, the weight of that evidence was for the trial court to assess. See Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) (holding that the trial court assesses the weight of evidence and the credibility of testimony). The evidence also indicates that the parties will continue to live in the same residence after the divorce until an agreement on the disposition of that property is reached. Moreover, when a trial court properly orders joint physical custody to the parties, payment of child support by one spouse to the other is not mandatory. McElheny v. Peplinski, 66 So.3d 274, 282 (Ala. Civ. App. 2010) (citing Allen v. Allen, 966 So.2d 929, 932-33 (Ala. Civ. App. 2007), quoting in turn Boatfield v. Clough, 895 So.2d 354, 357 (Ala. Civ. App. 2004) ). Although we might have reached a different conclusion than the trial court as to this issue, we cannot hold that the failure to award child support under these circumstances is reversible error."
Id. at 705-06.
The mother notes that, according to their respective CS-41 forms, the father earned $16,667 per month and the mother earned $2,429 per month at the time of the trial. The father testified, however, that he expected to earn $12,500 per month following the parties' divorce, and the child-support calculation that the father submitted used $12,500 as his monthly income. Unlike the wife in Bonner, the mother in this case does not address any specific deficit that will arise in the absence of child support; she argues only generally that the children will suffer financial disruption. The record contains no evidence that such disruption will occur.
As already noted, the list of expenses the mother anticipated incurring following *89 the parties' divorce included expenses and health insurance for the children. The trial court also awarded the mother periodic alimony in the amount of $1,000 per month for 24 months. The trial court's judgment provides for "equal time with each parent" and requires the father to pay the children's "day-to-day expenses" that arise during his custodial time and to maintain health insurance for them. Although the trial court's judgment requires the parties to share equally in the expenses related to the children's extracurricular activities, it limits that mandate to expenses that are reasonable and requires each party to take into consideration the other "party's ability to afford the same." In light of the foregoing, we decline to reverse the trial court's judgment based solely on the evidence presented regarding the disparity between the father's income and the mother's income.[5]
AFFIRMED.
Pittman, Thomas, Moore, and Donaldson, JJ., concur.
Thompson, P.J., concurs in the result in part and dissents in part, with writing.
THOMPSON, Presiding Judge, concurring in the result in part and dissenting in part.
I concur in the result reached by the main opinion with regard to the issue of the award of joint physical custody. I might not have reached the same result as did the trial court. However, the trial court's decision is supported by its receipt of ore tenus evidence and its thoughtful findings of facts regarding the best interests of the children at issue. See Ex parte Fann, 810 So.2d 631, 632-33 (Ala. 2001) (explaining the presumption of correctness in favor of the trial court's judgment when it receives ore tenus evidence).
However, I disagree with that part of the main opinion that affirms the granting of alternating decision-making authority to the parents. The record in this case demonstrates that the parties have not communicated well and that the father's level of involvement with the children, particularly the children with special needs, demonstrates a lack of interest in or awareness of their issues. The children, particularly those with special needs, need the stability of decision-making by one parent. The parties' youngest children were eight years old at the time of the entry of the divorce judgment. I would reverse as to that issue and direct the trial court to enter a judgment that best ensures stability in the lives of the parties' children.
I also dissent from the affirmance of the trial court's failure to award child support. The disparity in the parties' incomes is extreme in this case, and, as the trial court *90 recognized, both parties need to have the assistance of a sitter in order to care for and transport the children when they are at work. The effect of the trial court's judgment is to require the mother, who expects to earn less than $30,000 per year, to provide a home, to pay for the care of the children, and to support the children to the same extent as will the father, who earns approximately $200,000 annually. Shared physical custody is a reason for deviating from the application of the Rule 32, Ala. R. Jud. Admin., child-support guidelines, but such a deviation is not required merely because the parties share physical custody. See Rule 32(A)(1), Ala. R. Jud. Admin. Given the facts of this case, I dissent from the main opinion's affirmance of that part of the judgment that declined to award child support. See Green v. Green, [Ms. 2160986, May 18, 2018] So. 3d , (Ala. Civ. App. 2018) (per Pittman and Moore, JJ., with Thompson, P.J., concurring in the result) ("Although a deviation from the child-support guidelines would be permissible in this case, by going so far as to not award child support in light of the particular joint-physical-custody schedule in this case, we agree with the mother that the circuit court abused its discretion.").

The mother testified that Wyatt and Bailey had been conceived via "IVF," which we presume to mean in vitro fertilization.

The trial court's judgment contains an asterisk, but the reason for its usage is unclear.

Among other cases, the mother also cites Cowperthwait v. Cowperthwait, 231 So.3d 1101 (Ala. Civ. App. 2017), D.M.P.C.P. v. T.J.C., 138 So.3d 296 (Ala. Civ. App. 2012), Alexander v. Alexander, 65 So.3d 958 (Ala. Civ. App. 2010), Bishop v. Knight, 949 So.2d 160 (Ala. Civ. App. 2006), and DuBois v. DuBois, 714 So.2d 308 (Ala. Civ. App. 1998), in support of her argument. In response, the father asserts:
"[I]n every case cited by the [mother], this Court refused to reverse the trial court's decision and stated in each case what this Court has ruled again. Namely, this Court's job is not [to] reweigh ore tenus evidence and substitute its own judgment for that of the trial court."
Of the cases cited by the mother, we reversed a trial court's custody determination in only Bishop, 949 So.2d at 168. However, that case is distinguishable because, among other reasons, it was "undisputed that the trial court was bound to apply the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984)," as opposed to the best-interest standard used in making an initial custody determination. 949 So.2d at 166.

As noted above, the father mentioned a potential monthly child-support obligation of $3,326 during his testimony. The reason for the discrepancy between the figures is unclear.

We agree with the observation set out in the special writing that a deviation from the child-support guidelines was not "required merely because the parties share physical custody." 268 So.3d at 90 (emphasis added). However, for the reasons already explained, the trial court was not precluded from doing so. Regarding the portion of this court's recent decision in Green v. Green, 264 So.3d 898, ---- (Ala. Civ. App. 2018), that is quoted in the special writing, the main opinion in Green did not reverse that trial court's failure to award that mother child support based on a disparity of income between those parties. That portion of the main opinion in Green was instead based on the following reasoning: "[P]ursuant to the May 12, 2017, modification judgment under review, the child lives with the mother for substantially longer periods than he lives with the father." --- So. 3d at ---- (per Pittman and Moore, JJ., with Thompson, P.J., concurring in the result). In this case, the trial court declined to award the mother child support precisely "based on the parties having equal access to the children" (emphasis added), which decision was within its discretion. See Bonner, 170 So.3d at 705.